168 P.3d 546

**Annie PAUL, Inspector # 260 and Auto Shine II, Inspector Station # 429, Respondent–Appellant–Appellee,**

v.

**DEPARTMENT OF TRANSPORTATION, STATE OF HAWAI'I, Appellee–Appellant.**

**No. 27238.**

Supreme Court of Hawai'i.

Sept. 24, 2007.

Christopher J. Roehrig of Roehrig, Roehrig, & Wilson, on the briefs, Kamuela, for the respondent-appellant-appellee Annie Paul.

Wayne A. Matsuura, Deputy Attorney General, on the briefs, for the appellee-appellant Department of Transportation, State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

The appellee-appellant State of Hawai'i Department of Transportation (DOT) appeals from the March 18, 2005 judgment on appeal of the third circuit court, the Honorable Ronald Ibarra presiding, entered in favor of the respondent-appellant-appellee Annie Paul and against the DOT.

The director of the DOT [hereinafter, "the director"] had earlier: (1) adopted the recommended order of a DOT administrative hearings officer (AHO), following a contested-case hearing in which the AHO found and concluded that Paul had failed to perform vehicle safety inspections in accordance with Hawai'i Administrative Rules (HAR) chs. 19–133.2 (1994) (governing the periodic inspection of vehicles) and 19–133.5 (1994) (governing the suspension or revocation of an official inspection station or inspector's certification) and Hawai'i Revised Statutes (HRS) ch. 286 (1993) (pertaining to highway safety); and (2) affirmed the September 23, 2002 notice of revocation of Paul's right to conduct vehicle inspections.

On July 8, 2004, Paul appealed to the third circuit court, which, on February 7, 2005, concluded that HAR §§ 19–133.2–28 to 19–133.2–38,[1] the relevant HAR provisions at issue [hereinafter, "the inspection procedures"], were not vague when read individually but, when read in conjunction with HAR § 19–133.2–40 (Rule 40),[2] were, in the aggre-

---

**1.** HAR § 19–133.2–28 through –38(1) set forth detailed procedures to be followed by licensed motor vehicle safety inspectors ·in carrying out inspections on steering and suspension systems, tires and wheel alignment, wheels, brakes, lamps and reflectors, horns, glazing material, body and sheet metal components, the exhaust system, the intake and fuel systems, and the speedometer and odometer, and (2) establish criteria constituting failure in each of those areas.

**2.** HAR § 19–133.2–40 provided that "[i]nspection of all required components, as set forth in [HAR §§ ]19–133.2–27 to 19–133.2–38, may be

gate, "vague and indefinite ... [and,] therefore[,] unconstitutional under [HRS] § 91–14(g) [ (1993) ].... "[3] On March 18, 2005, the circuit court entered judgment in favor of Paul and against the DOT.

On appeal to this court, the DOT asserts: (1) that, under rules of statutory construction, the inspection procedures and Rule 40, read together, are not void for vagueness; (2) that, insofar as Paul does not dispute that forty of the seventy-five documented failures to inspect that she committed did not implicate Rule 40, she did not establish any prejudice to her substantial rights, *see* HRS § 91–14(g), *supra* note 3; and (3) that, inasmuch as she conceded under oath that she was unaware of Rule 40 until more than a year after her inspector's license was revoked, she could not have been prejudiced by any purported vagueness imported into the regulations by the wording of Rule 40.

For the reasons discussed *infra* in section III, we hold that the inspection procedures and Rule 40, taken as a whole, were not unconstitutionally void for vagueness. We therefore vacate the circuit court's March 18, 2005 judgment and remand for further proceedings consistent with this opinion.

## I. *BACKGROUND*

### A. *The Initial Revocation*

During July and August 2002, DOT inspector Tyrus Takimoto conducted video surveillance of Paul's inspection station to observe the manner in which she conducted vehicle safety inspections. Paul testified that she was aware of the surveillance. Takimoto observed Paul issuing safety stickers without conducting required system checks, in many instances failing to conduct even visual inspections of relevant vehicle systems such as steering and suspension, brakes, and the intake and fuel systems.[4]

On September 23, 2002, the DOT revoked Paul's motor vehicle safety inspector certificate. The DOT based the revocation upon seventy-five incidents observed by Takimoto in which Paul failed to conduct required inspections of vehicle components during the inspection of eighteen vehicles. On September 30, 2002, Paul filed a petition for a contested-case hearing. Hearings were conducted on January 15 and March 5, 2004.

Testimony at the hearings focused in part on the DOT's harmonization of the inspection procedures with Rule 40:

[Paul]: [Rule 40] tells you that there doesn't have to be a brake test. You can do an inspection visually, correct?

Takimoto: Not necessarily.

[Paul]: What does it say? It says sections 27 through 38. That includes brakes, right?

Takimoto: Correct.

---

performed visually and a vehicle certified in compliance with this chapter based upon the general appearance of the vehicle." Effective December 2, 2005, the DOT's Motor Vehicle Safety Office repealed HAR § 19–133.2–40.

**3.** HRS § 91–14(g) (1993) provided:

*Upon review of the record the court* may affirm the decision of the agency or remand the case with instructions for further proceedings; or it *may reverse* or modify *the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:*
(1) *In violation of constitutional* or statutory *provisions;* or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
(Emphases added.) On July 1, 2006, the legislature amended HRS § 91–14 in respects immaterial to the present matter. *See* 2004 Haw. Sess. L. Act 202, §§ 8 and 85 at 921, 948.

**4.** The circuit court found that none of the director's findings of fact were clearly erroneous and Paul did not challenge the director's findings either on appeal to the circuit court or to this court. Rather, she focuses her arguments on the conclusion of law that HAR §§ 19–133.2–28 through –38, read in conjunction with Rule 40, are void for vagueness. Therefore, we cite to the recommended decision and order, adopted by the director in its entirety, for salient uncontested facts.

[Paul]: And it says tests can be performed visually. Now visually isn't driving the car around is it?

Takimoto: Right. But it says may be performed, and in the specific section about brakes it does indicate about the brake pedal travel and a test drive, that four to eight miles per hour test drive . . . .

[Paul]: *This test says it can be done visually, doesn't it? This section says, the tests for all these sections can be done visually. Visually means you don't drive, doesn't it? Visually means that you just look at something, doesn't it?*

Takimoto: *For those areas, sections, components . . . that [are] applicable, to be done a visual inspection.*

[Paul]: *Oh, so that's your interpretation. That when it says visual here, it doesn't mean visual for all these sections, but just certain sections?*

Takimoto: *Yes.*

[Paul]: OK. And then it says vehicles . . . can be certified in compliance with this chapter, that means the entire inspection chapter, based on the general appearance of the vehicle. What does that mean? General appearance of the vehicle. Do you know what that means?

Takimoto: As far as its condition.

[Paul]: So you can just look at the general appearance of the vehicle and certify it. Is that what that says?

Takimoto: Again, in compliance with the other specified sections where . . . it is applicable. . . .

. . . .

[Paul]: *So, your interpretation of that, even though it says you can do a visual check for all these sections, you say that doesn't apply to the sections where you have to drive. Is that correct?*

Takimoto: *Yes.*

(Emphases added.) Paul herself testified that when she tested a vehicle's brakes she would perform more than a visual inspection: Paul's counsel asked her, "So, . . . how would you check the brakes, or what . . . observations[ ] could you make regarding them?" to which she responded, "You could just go in the car and press on the brakes and make sure it doesn't go right down to the floor."

John Lovstedt, a motor vehicle safety officer with the DOT's Highways Division who bore primary responsibility for enforcing the periodic motor vehicle inspection program, testified that DOT inspectors had interpreted Rule 40 in conjunction with the inspection procedures in order (1) to harmonize them in practice and (2) to support "the objective [of the motor vehicle safety inspection program, which] is to reduce the number of mechanical or component failures[,] thereby reducing the probability of crashes and improving highway safety":

[Paul]: *. . . [W]hen [Rule 40] says the certificate of inspection can be issued based upon the general appearance of the vehicle, what does that mean to you?*

Lovstedt: *That means that there are times when just a visual inspection will be adequate. There are other times when it won't be adequate.*

[Paul]: Does it say there that there are times when it's not . . . adequate?

Lovstedt: It doesn't in that phrase right where you are reading.

[Paul]: That's your interpretation.

Lovstedt: But if you were to take that and read it the way you want to understand it, you might as well throw everything out.

[Paul]: I didn't make the rules. . . .

. . . .

Lovstedt: . . . I'm showing you how these rules are to be interpreted. And if you look a[t] the part on brakes as an illustration, it says that it shall be based upon a performance test. It doesn't say observation.

[Paul]: Where's it say that? It doesn't . . . say that in the rules.

Lovstedt: ["]Service and parking brake systems shall be inspected for performance.["]

[Paul]: Period. OK.

Lovstedt: It doesn't say observation; it says performance.

[Paul]: [Rule 40] says regarding the inspection requirements [set forth in HAR

§§ 19–133.2–]27 through [–]38, . . . general appearance of the vehicle can support a certificate of inspection. That is what it says.

Lovstedt: Now, the purpose of that is not to negate everything that was written before it. You're taking the last section there and canceling everything out.

[Paul]: . . . I'm not canceling it out. I'm reading what it says.

Lovstedt: How would you . . . inspect the horn visually? You wouldn't be able to do it.

[Paul]: It says you can do it here. I didn't make the rules. It says regarding all the previous requirements, that it can be done visually. . . .

Lovstedt: . . . It says may. The word may is there so that [ . . . ]

[Paul]: *So that leaves an alternative to people doing inspections. They may do it this way if they want to, right?*

Lovstedt: *If they find a way that they can do the inspection without a measurement, they may.*

[Paul]: *Where does it say that?*

Lovstedt: *In the rules. That's the purpose of the word may.*

. . . .

[Paul]: Have you told [DOT motor vehicle control inspector Michael] Hanohano and . . . Takimoto or any of your . . . people that work for the County that an inspection may be done visually, and they don't necessarily have to drive the vehicle?

. . . .

Lovstedt: I never said that they don't have to drive a vehicle.

[Paul]: Did you tell them that they may do it visually?

Lovstedt: The brake test?

[Paul]: Any of the tests, brake test included.

Lovstedt: No, I didn't say that.

[Paul]: Why not? That's what the rules say.

Lovstedt: That's not the intent. . . .

(Emphases added.) Hanohano and Takimoto both testified that they had consistently informed Paul that it was necessary to enter the vehicle, look under the hood, and, with respect to some components such as brakes, to perform more than purely visual inspections in order to certify a vehicle properly. Takimoto recalled that, when Paul's license to inspect had first been suspended in June 2001, "it was the same type of . . . cursory checks, . . . the basic operation of lights, turn signals, brake lights and whatnot, no test-drive, no getting into the vehicle, checking under the hood or under the vehicle for suspension checks, that resulted in [her] suspension." Paul responded that, previous to the issuance of the challenged revocation in September 2002, she had never been informed by DOT personnel that a test-drive was required and that she believed that she was complying with the safety inspector requirements, asserting that she was aware she was being videotaped but nevertheless did not change her procedure in the belief that it was sufficient. She testified that, to her knowledge, no inspection stations test-drove cars and that she believed Takimoto, upon assuming Hanohano's duties, had changed the inspection standards and had singled her out for enforcement.

Takimoto conceded that, in the approximately twenty instances that he submitted his own vehicle for inspection, no inspector had ever test-driven it. He also conceded that he had, in the past, issued violations to Paul for infractions that, after further research (often at Paul's instigation), were found to be groundless or had resulted from conflicting advice to Paul from other DOT employees. He further conceded that he had been informed of other inspection stations that did not test-drive vehicles and that he had not investigated any of those reports.

On May 5, 2004, the AHO submitted his recommended decision and order (RDO) to the director of the DOT. The AHO found that Paul had failed to perform vehicle inspections pursuant to requirements set forth in HAR chs. 19–133.2, 19–133.5,[5] and HRS

---

**5.** HAR § 19–133.5, entitled "Suspension or Revocation of an Official Inspection Station or Inspector's Certification," sets forth the DOT's regulations and procedures for revoking certifi-

ch. 286, Part II.[6] The AHO concluded that, in order to conduct a proper inspection, it was "necessary to enter the vehicle and look underneath the vehicle (steering and suspension), test-driv[e the] vehicle (brakes), [and] look[ ] under the hood (intake and fuel system)." He found, based on the videotape evidence, that Paul had failed to perform these tasks during eighteen vehicle inspections, resulting in a total of seventy-five infractions of the inspection rules. The AHO added that "[w]hat is more troubling is the fact that on every car which [Paul] inspected she had neglected to comply with requirements which are the most important in determining how road safe the cars were.... This, of course, defeats the whole objective of the inspection program." The AHO then concluded that Paul "failed to establish by a preponderance of the evidence that the [DOT] did not present sufficient proof to establish the violations alleged."[7] The AHO then noted that

> [t]he foregoing conclusion is further strengthened by the record that reflects that [Paul]'s license had been previously suspended for a period of ninety days. This notice of suspension (dated June 28, 2001) was for violations which mirror those found in the present proceeding: failure to test drive the vehicle, failure to enter or check under the vehicle and failure to check under the hood to conduct inspections. Therefore, for [Paul] to now claim she was unaware of these requirements has to be regarded as disingenuous.

The AHO affirmed the September 23, 2002 revocation.

On May 18, 2004, Paul submitted written exceptions and arguments opposing the AHO's RDO but, on June 15, 2004, the director concluded "that the exceptions and argument do not warrant the denial, modification, or reversal of the hearing officer's [RDO]" and adopted the AHO's RDO as his final decision and order (FDO).

### B. *The Circuit Court Appeal*

On July 8, 2004, Paul filed a notice of appeal in the third circuit court, arguing, *inter alia*, that the director erred in revoking her inspection license because: (1) Rule 40 authorized purely visual inspections based upon the general, overall appearance of a vehicle; and (2) that the rules were "so vague and indefinite as to allow arbitrary and discriminatory enforcement." Paul also reiterated her arguments that she had been improperly singled out for enforcement, contending that she conducted inspections in reliance on what she alleged was accepted practice under previous inspectors and that, in the case of uncertainty, had consistently sought guidance from the DOT. She alleged that Takimoto dealt unfairly with her and engaged in discriminatory enforcement against her. (Citing *State v. Villeza*, 85 Hawai'i 258, 942 P.2d 522 (1997); *Filipo v. Chang*, 62 Haw. 626, 618 P.2d 295 (1980).)

The DOT maintained that the rules were not void for vagueness but, rather, (1) characterized HAR §§ 19–133.2–28 through –38 as specific rules and Rule 40 as a general rule that could be reasonably interpreted *in pari materia* (a) to avoid absurd interpretations and (b) to effectuate the purposes behind their promulgation, (2) that the agency interpretation should be given deference, and (3) that repeal by implication was disfavored.

---

cation of inspectors and inspection stations. *Available at* http://www.state.hi.us/dot/highways/adminrules/133.5.pdf.

6. HRS ch. 286 is entitled "Highway Safety"; part II concerns the inspection of vehicles. HRS § 286–21 (1993), entitled "[v]ehicles without required equipment or in unsafe condition," is cited by the DOT for the legislature's stated purpose behind a responsibly run vehicle inspection program:

> No person shall drive or cause to move on any highway any motor vehicle, trailer, semi-trailer, or pole trailer, or any combination thereof, unless the equipment thereon is in good working order and adjustment as required in this part so as not to endanger the driver or other occupant or any person upon the highway.

(Underscored portion quoted by the DOT.)

7. The hearing was conducted pursuant to HRS § 91–10 (Supp.2003), which provides in relevant part that "[e]xcept as otherwise provided by law, the party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence."

(Citing, *inter alia, State v. Batson,* 99 Hawai'i 118, 120, 53 P.3d 257, 259 (2002); *Maha'ulepu v. Land Use Comm'n,* 71 Haw. 332, 339, 790 P.2d 906, 910 (1990).) It further alleged that, assuming *arguendo* that Rule 40 allowed for purely visual inspection of components, forty of the seventy-five infractions committed by Paul involved a failure to inspect the component in question through even a visual inspection, establishing a sufficient basis for revocation of her inspector's license. Finally, it argued that, insofar as Paul herself conceded that she was unaware of Rule 40 prior to October 16, 2003, more than one year after the DOT initiated the revocation proceedings, she could not have suffered prejudice to her substantial rights, *see* HRS § 91–14(g), *supra* note 3, in relying on any alleged vagueness in its wording.

On November 22 and 23, 2004, the circuit court conducted a hearing. Paul argued that, insofar as the DOT promulgated Rule 40 later in time than the specific inspection procedures, Rule 40 controlled and, hence, that an inspector could grant a certificate "based upon the general appearance of the vehicle" without having to test any of the required functions of the car as described in the inspection procedures. The court then inquired:

> The Court: How do you inspect the speedometer . . .?
>
> [Paul]: One way to do it would be to drive it. Or if the general appearance of the vehicle qualifies, then—*I'm not sure what was going through people's heads when they made this.* . . . But you don't have to do the same type inspection [of an older car as] you would' do based upon a vehicle whose general appearance is okay.
>
> *I don't know exactly why they put this rule in there, but certainly that rule has some meaning.* It specifically refers to all the prior sections. And it says: Irrespective of these, a vehicle may be certified based upon a general appearance, and that may be performed visually.

> . . . .
>
> . . . This is in reality what people do. This is how inspections take place. You know, this list of things under what the brakes, body, or anything—none of those ever take place on an inspection. They just don't happen.
>
> *So my opinion, based on all these rules, someone should go back and look at these rules. They don't make sense. Clean them up* . . . .

(Emphases added.)

The DOT acknowledged "that [Rule 40] is not perfectly written" but contended (1) that the court owed deference to the agency's interpretation and (2) that the inspection procedures were specific requirements that should take precedence over the general language of Rule 40. The court observed that the specific nature of the inspection procedures would appear to render Rule 40 surplusage, but the DOT maintained that Rule 40 was, in fact, complementary to the inspection procedures, creating the alternative of a visual inspection in some instances:

> [DOT]: . . . *You could [inspect a component] visually by looking at it or you could have some kind of instruments.*
>
> The Court: That's what [Paul] says . . ., right? You could look at it visually.
>
> [DOT]: Or there could be a requirement of instruments. So I would argue that . . . *Rule 40 is saying you can do it visually and not require specific instruments. You can look at a fuel hose. If it's leaking, you don't have to do any kind of measurement.*
>
> . . . .
>
> . . . I wish I could have pulled up some kind of legislative [8] history. But people are gone and retired. . . . [W]hat we have here is the language of the rule. And based on the language of this rule and compared to the specific inspection rules, that's the way the department has been interpreting it. *Components you can inspect visually. . . . Performance*

---

**8.** To be precise, the promulgation of the HAR is an executive, not legislative, activity. Counsel for the DOT was, therefore, presumably referring to possible administrative statements of purpose or working papers regarding Rule 40.

*or function of components, like brakes, . . . [y]ou got to drive it.*

(Emphases added.) The circuit court pursued this line of reasoning, challenging Paul's assertion that a general visual inspection could satisfy the detailed requirements of the inspection procedures. Speaking specifically of HAR § 19–133.2–31,[9] the circuit court inquired:

> The Court: . . . How can you physically inspect? . . . [See] paragraph B–3: The steering wheel moves abruptly to left or right of center when the brake is applied at 4 to 8 miles per hour on a clean, smooth, dry[,] hard surface.
>
> [Paul]: *Right. I don't know. That doesn't make any sense, Judge.* . . . But everything else . . . [e]ven the driving is visual. Everything is visual. There is no test that's not visual. The jerking of the steering wheel is visual. Everything is visual.
>
> . . . .
>
> The Court: How would an inspection take place in this interpretation?
>
> . . . .
>
> [Paul]: *I'm not sure what general is other than I think it's a cursory looking at the vehicle to see if something pops out at you.* But it's not driving it.

(Emphases added.) Paul contended that the level of detail in the inspection procedures made it "impossible" for an inspector to comply fully with all the testing requirements set forth therein and that Rule 40 addressed the problem by making the general appearance of the vehicle as a whole a sufficient basis upon which to certify it.

9. HAR § 19–133.2–31 (1989), entitled "[i]nspection of brakes," provides:
 (a) Service and parking brake systems shall be inspected for performance.
 (b) No certificate of inspection shall be issued if any of the following occurs:
 (1) The brake pedal height decreases when the pedal is depressed and light pulsating pressure is applied to the brake pedal;
 (2) Excessive brake pedal travel is required to apply the brakes;
 (3) The steering wheel moves abruptly to left or right of center when the brake is applied at four to eight miles per hour on a clean, smooth, level, dry, hard surface.

On December 14, 2004, the circuit court entered a minute order granting Paul's appeal on the sole ground that the inspection procedures and Rule 40, when read together, were "vague and indefinite, and [we]re therefore unconstitutional under HRS § 91–14(g)(1)," *see supra* note 3. It did not, however, find any of the FDO's findings of fact [FOFs] to be clearly erroneous but, rather, stated that "[w]ith the exception of the foregoing error, the Administrative Decision entered in the proceedings below does not contain any error that would warrant reversal or modification under § 91–14(g), HRS." On March 17, 2005, the circuit court entered a judgment on appeal in Paul's favor and against the DOT. On April 13, 2005, the DOT filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

### A. Review Of Agency Decisions

▮▮▮▮ Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

*Bragg v. State Farm Mutual Auto. Ins.*, 81 Hawai'i 302, 304, 916 P.2d 1203, 1205

(4) There is visible indication of hydraulic fluid leakage around reservoir, cylinders, calipers, backing plates, tubing, hoses, or connections;
(5) The parking brake, when applied on a level dry surface, cannot hold the vehicle in place with transmission in low range and engine RPM increased to double idle RPM;
(6) Required clips, clevis, or cotter pins are not properly installed or missing; or
(7) Brake system components rubbing against the body, frame[,] or suspension system.

(1996) (quoting *Univ[.] of Hawai'i Prof['']l Assembly v. Tomasu,* 79 Hawai'i 154, 157, 900 P.2d 161, 164 (1995)). HRS § 91–14(g) provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1993). "Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); [FOFs] are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Bragg,* 81 Hawai'i at 305, 916 P.2d at 1206.

*Konno v. County of Hawai'i,* 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997), *quoted in In re Water Use Permit Applications,* 94 Hawai'i 97, 118–19, 9 P.3d 409, 430–31 (2000).

B. *Conclusions Of Law (COLs)*

 " 'A COL is not binding upon an appellate court and is freely reviewable for its correctness.' " *AIG Hawaii Ins. Co. v. Estate of Caraang,* 74 Haw. 620, 628, 851 P.2d 321, 326 (1993) (quoting *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28 (1992)). This court ordinarily reviews COLs under the right/wrong standard. *In re Estate of Holt,* 75 Haw. 224, 232, 857 P.2d 1355, 1359 (1993). Thus, " '[a] COL that is supported by the trial court's [FOFs] and that reflects an application of the correct rule of law will not be overturned.' " *Estate of Caraang,* 74 Haw. at 628–29, 851 P.2d at 326 (quoting *Amfac, Inc.,* 74 Haw. at 119, 839 P.2d at 29). "However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." *Id.* at 629[, 851 P.2d 321], 851 P.2d at 326 (quoting *Amfac, Inc.,* 74 Haw. at 119, 839 P.2d at 29) (internal quotation marks omitted).

*State v. Furutani,* 76 Hawai'i 172, [180], 873 P.2d 51, [59] (1994).

*Allstate Ins. Co. v. Ponce,* 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004) (some brackets and internal citations omitted and some bracketed material altered.)

C. *Interpretation Of Statutes*

 The interpretation of a statute is a question of law reviewable *de novo.* *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996).

Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose....

*Gray [v. Admin. Dir. of the Court],* 84 Hawai'i [138,] 148, 931 P.2d [580,] 590 [ (1997) ] (footnote omitted).

*State v. Koch,* 107 Hawai'i 215, 220, 112 P.3d 69, 74 (2005) (quoting *State v. Kaua,* 102 Hawai'i 1, 7–8, 72 P.3d 473, 479–80 (2003)). Furthermore,

> [i]n construing an administrative rule, general rules of statutory construction are applicable. *Mahiai v. Suwa,* 69 Haw. 349, ... 358, 742 P.2d 359, 366 (1987). When a rule does not conflict with statutory and constitutional requirements, courts will as-

certain and effectuate the intent of the agency which promulgated the rule. *Life of the Land, Inc. v. West Beach Dev. Corp.*, 63 Haw. 529, 531, 631 P.2d 588, 590 (1981); *Mahiai*, 69 Haw. at 358, 742 P.2d at 366. "Courts strive to give meaning to all parts of an administrative rule and to avoid construing any part as superfluous." *Int'l Bhd. of Elec. Workers[, Local 1357] v. Hawaiian Tel. Co.*, 68 Haw. 316, 325, 713 P.2d 943, 951 (1986). Courts will not construe rules in a manner which produces an absurd result. *Mahiai*, 69 Haw. at 358, 742 P.2d at 367.

*Williams v. Hawaii Med. Serv. Ass'n*, 71 Haw. 545, 549–50, 798 P.2d 442, 445 (1990). Moreover, " '[a statute or ordinance] will not be held unconstitutional by reason of uncertainty if any sensible construction embracing the legislative purpose may be given it. Mere difficulty in ascertaining its meaning, or the fact that it is susceptible to interpretation will not render it nugatory.' " *State v. Kamal*, 88 Hawai'i 292, 294, 966 P.2d 604, 606 (1998) (quoting *State v. Taylor*, 49 Haw. 624, 635, 425 P.2d 1014, 1021 (1967)) (brackets in original).

## III. *DISCUSSION*

### A. *The Parties' Arguments*

#### 1. *The DOT*

The DOT contends that the circuit court erred by reading the inspection procedures and Rule 40 in conflict, thereby concluding that they were vague and indefinite, rather than harmonizing them to give effect to all and furthering the legislative purpose of promoting highway safety. (Citing *Gardens at West Maui Vacation Club v. County of Maui*, 90 Hawai'i 334, 343, 978 P.2d 772, 781 (1999); *Exxon Corp. v. Busbee*, 644 F.2d 1030, 1034 (5th Cir.1981).) It points out that, while Paul asserts, as an example, that Rule 40 authorized purely visual inspection of the brake components, she herself concedes that a physical test is necessary to assess the integrity of a vehicle's brakes and argues that the language of Rule 40 authorized certification based upon a visual inspection of *individual components*, if practical, but not upon a mere cursory visual inspection of the overall vehicle.

The DOT also contends that Paul could not have suffered prejudice to her substantial rights—within the meaning of HRS § 91–14(g), *see supra* section II.A—from any alleged vagueness introduced by Rule 40 because (1) she conceded in testimony she was unaware of the provisions of Rule 40 until more than a year after her inspection license was revoked and (2) assuming *arguendo* that Paul relied upon Rule 40, insofar as forty of the seventy-five infractions upon which her revocation was based involved failures to inspect components even visually—as prescribed by Rule 40—the record contained sufficient evidence to support revocation of her inspection license. (Citing, *inter alia, Mahiai*, 69 Haw. at 359, 742 P.2d at 367.)

#### 2. *Paul*

##### a. *Paul argues for the penal rather than civil test for vagueness*

Paul asserts that her inspector's license should be considered a due process interest "in property and [an] ability to work," revocation of which requires this court to apply the more stringent penal standard for vagueness. (Citing, *inter alia, Giaccio v. Pennsylvania*, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966); *Kamal; State v. Gaylord*, 78 Hawai'i 127, 890 P.2d 1167 (1995); *State v. Lee*, 75 Haw. 80, 856 P.2d 1246 (1993); *Kernan v. Tanaka*, 75 Haw. 1, 21–22, 856 P.2d 1207, 1218 (1993); *State v. Kameenui*, 69 Haw. 620, 753 P.2d 1250 (1988); *Maeda v. Amemiya*, 60 Haw. 662, 669, 594 P.2d 136, 141 (1979); *State v. Manzo*, 58 Haw. 440, 573 P.2d 945 (1977).) (Quoting *State v. Grahovac*, 52 Haw. 527, 534–35, 480 P.2d 148, 153 (1971) ("It is fundamental that a penal statute clearly define proscribed behavior, for failing this, definitional uncertainty denies an accused 'due process of law' guaranteed by the 14th Amendment to the Federal Constitution and Art[icle] I, s[ection] 2 of the Constitution of Hawaii.").) She contends that the penal standard should apply because the term "penal" "pertains to any punishment or penalty and relates to acts which are not necessarily delineated as criminal." (Citing HRS § 701–107 (concerning grades and

classes of offenses); *State v. Simeona*, 10 Haw.App. 220, 231, 864 P.2d 1109, 1115 (1993), *overruled on other grounds by State v. Ford*, 84 Hawai'i 65, 929 P.2d 78 (1996); *Black's Law Dictionary* 1132 (6th ed.1990).)

 b. *Paul maintains that the vagueness of the rules allows arbitrary and inconsistent enforcement that violates her rights to due process.*

■■■■ Paul reiterates her argument that Takimoto selectively enforced the inspection requirements against her. She catalogues a list of alleged infractions for which Takimoto had issued her citations but which the DOT ultimately determined were not based on valid interpretations of the regulations and that were later withdrawn.[10] She specifically abandons, however, her earlier argument that Takimoto's allegedly arbitrary, selective enforcement alone should nullify the revocation of her license and instead insists that she now raises the issue of allegedly selective enforcement only to demonstrate the constitutionally unsound nature of the regulations, in that they are so vague and standardless as to allow "arbitrary and discriminatory enforcement and the delegation of basic policy matters to persons for resolution on an *ad hoc* and subjective basis." (Citing *Lee*, 75 Haw. at 93, 856 P.2d at 1254 (1993).)

 B. *The Circuit Court Erred In Concluding That HAR §§ 19–133.2–28 Through –38 And Rule 40, When Read Together, Were Void For Vagueness.*

■■■■ As a preliminary matter, we note that Paul fails to identify the point in the agency hearings or in the circuit court at which she argued that the criminal rather than civil standard for vagueness should apply to the inspection procedures and Rule 40. It is well settled that appellate courts

"will not consider an issue not raised below unless justice so requires. *Earl M. Jorgensen Co. v. Mark Constr. Inc.*, 56 Haw. 466, 476, 540 P.2d 978, 985 (1975); *Han v. Yang*, 84 Hawai'i 162, 176–77, 931 P.2d 604, 618–19 (App.1997). In determining whether to address a new issue raised on appeal, this court must decide " 'whether consideration of the issue requires additional facts; whether the resolution of the question will affect the integrity of the findings of fact of the trial court; and whether the question is of great public importance.' " *Jorgensen Co.*, 56 Haw. at 476, 540 P.2d at 985 (quoting *Fujioka v. Kam*, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973))."

*Hill v. Inouye*, 90 Hawai'i 76, 82, 976 P.2d 390, 396 (1998) (quoting *State Farm Mut. Auto. Ins. Co. v. Dacanay*, 87 Hawai'i 136, 145 n. 14, 952 P.2d 893, 902 n. 14 (App.1998)).

 Paul's argument for a heightened standard of scrutiny does not necessitate any additional fact-finding on this court's part, and our resolution of it will not "affect the integrity of the findings of fact of the [circuit] court," *id.* But neither is the question of great public import, insofar as Rule 40 has been repealed and Paul's point of error on appeal is unlikely to arise again. We would, therefore, be justified in deeming the argument waived. Nevertheless, assuming *arguendo* that Paul properly preserved the argument, it fails on its merits.

 1. *The revocation of Paul's inspector's license was civil, rather than criminal, in nature.*

■■■■ HAR chs. 19–133.2 and –133.5 do not contain an express statement that the regulations should be considered civil rather than criminal or penal in nature. *See* HAR chs. 19–133.2 and –133.5, *passim*. However, this court, in *State v. Guidry*, 105 Hawai'i 222, 96 P.3d 242 (2004), adopted a seven-factor test to determine whether a statute or regulation

---

10. Paul also requests that this court take judicial notice, pursuant to Hawai'i Rules of Evidence (HRE) Rule 201, that "prior to ... Takimoto issuing ... Paul a citation ... [,] inspectors in the State of Hawaii were not test driving a persons' [sic] vehicle during inspections." HRE Rule 201(b) requires that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the

territorial jurisdiction of the ... court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." As it is abundantly clear that the accuracy of the "fact" at issue—*i.e.*, procedures generally followed statewide by motor vehicle safety inspectors—is neither "generally known" nor "capable of accurate and ready determination," we decline Paul's request.

was criminal or civil in nature for purposes of constitutional review:

" '[ (1) ] [w]hether the sanction involves an affirmative disability or restraint; [ (2) ] whether it has historically been regarded as punishment; [ (3) ] whether it comes into play only on a finding of *scienter;* [ (4) ] whether its operation will promote the traditional aims of punishment-retribution and deterrence; [ (5) ] whether the behavior to which it applies is already a crime; [ (6) ] whether an alternative purpose to which it may rationally be connected is assignable for it; and [ (7) ] whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in different directions .' "

*Id.* at 235–36, 96 P.3d at 255–56 (brackets in *Guidry* ) (quoting *Russell v. Gregoire,* 124 F.3d 1079, 1084 (9th. Cir.1997) (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963))); *see also Tauese v. State,* 113 Hawai'i 1, 31–33, 147 P.3d 785, 815–17 (2006) (quoting *Mendoza–Martinez* ). Analyzing the revocation of Paul's inspector's license in light of the *Guidry* factors demonstrates that the sanction is civil in nature.

Revocation of an inspector's license does not involve an affirmative disability or restraint but, rather, merely represents the withdrawal of the state's permission, granted previously, to implement a program on behalf of the state and to collect a fee from the citizenry for doing so. In contrast to the license revocation in question, the cases that Paul cites in support of applying the penal standard for vagueness involved statutes that carried the possibility of imprisonment upon conviction or implicated the right to free speech. *See Kamal* (wherein the defendant was convicted of peddling in a proscribed area, in violation of Revised Ordinances of the City and County of Honolulu § 29–6.2, which at the time carried a penalty of up to

$1000.00 in fines and a one-year term of imprisonment); *Gaylord* (theft by failure to make a required disposition of funds, in violation of HRS § 708–830(6)(a), is, at a minimum, a misdemeanor carrying the possibility of imprisonment); *Lee* (a violation of HRS § 329–43.5 (Supp.1992) (prohibited acts related to drug paraphernalia) was a class C felony); *Kameenui* (a violation of HRS § 709–906 (Supp.1986), abuse of a family member, carried a minimum term of imprisonment of forty-eight hours); *Manzo* (a violation of HRS § 712–1214 (1976), promoting pornography, was a misdemeanor and implicated free speech concerns).

Nevertheless, the Intermediate Court of Appeals (ICA) has concluded in at least one instance that a statute may be penal in nature despite the fact that it does not carry the threat of imprisonment or implicate free speech. In *Simeona,* the defendant purposefully placed his boat in a DOT dry-storage area without proper authorization, hoping to provoke a citation in order to establish in court that the land upon which the storage area was located was, in fact, owned by his family and not the state. 10 Haw.App. at 223–27, 864 P.2d at 1111–13. Simeona requested a jury trial, based on the fact that a violation of HRS § 226–25 (Supp.1992) carried the possibility of a maximum fine of $10,000.00 for each violation, but the circuit court denied his request. *Id.* at 225, 864 P.2d at 1112.

The ICA, in answering the question whether the circuit court improperly denied Simeona his right to a jury trial, applied a two-pronged test borrowed from *United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), to determine whether the penalty was criminal or civil.[11] 10 Haw.App. at 230, 864 P.2d at 1114. The ICA implicitly recognized that HRS § 266–25 characterized any failure to comply with DOT harbor regu-

**11.** In *Ward,* the United States Supreme Court inquired, first, whether Congress intended that the penalty be civil or criminal in nature, and, second, if Congress indicated an intention that the penalty be civil in nature, whether the penalty was so punitive either in purpose or effect as to negate that intention. 448 U.S. at 248–49, 100 S.Ct. 2636. The Court warned, however,

that " 'only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground.' " *Id.* at 249, 100 S.Ct. 2636 (quoting *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)), *quoted in Simeona,* 10 Haw.App. at 230, 864 P.2d at 1114; *see also Tauese,* 113 Hawai'i at 31, 147 P.3d at 815–16 (quoting *Ward* ).

lations as a "violation," [12] which, as defined in HRS § 701–107(5) (1985), was non-criminal in nature.[13] 10 Haw.App. at 231, 864 P.2d at 1115. Nevertheless, it concluded that the legislature intended that the penalties in question be considered penal in character. *Id.* The ICA grounded its conclusion (1) in the language of HRS § 831–3.1(b)(3) (Supp. 1992) (pertaining to criminal records for prior convictions) that recognized " 'penal offense[s]' for which no jail sentence may be imposed" but which, nonetheless, generated a criminal record, (2) in the fact that the legislature did not describe the penalties in HRS § 226–25 as civil penalties, and (3) in the language of HRS § 266–24 (Supp.1992), which vested law enforcement powers in DOT employees to enforce the rules set forth in HRS § 226–25, including the powers of executing warrants and arresting offenders. *Id.* at 231–32, 864 P.2d at 1115.

In the present matter, the HAR provisions pursuant to which Paul's inspection license was revoked do not involve fines of any sort. *See* HAR § 19–133.5, *available at* http://state.hi.us/dot/highways/adminrules/133.5.pdf. Therefore, by the plain language of HRS § 701–107(5) (1993),[14] they do not qualify as penal measures under the HRS—not even as violations, the lowest level of infraction that itself does not constitute a crime—and the DOT's revocation of Paul's inspector's license does not, therefore, generate a criminal record to which HRS ch. 831 would apply. Moreover, we are unaware of any powers vested in the DOT officials overseeing the vehicle inspection program to serve and execute warrants or arrest "offenders."

Rather, as the United States Supreme Court noted in *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), in considering a defendant's debarment from the banking industry, it has been "long recognized that 'revocation of a privilege voluntarily granted,' such as debarment, 'is characteristically free of the punitive criminal element.' " *Id.* at 104, 118 S.Ct. 488 (quoting *Helvering v. Mitchell,* 303 U.S. 391, 399 & n. 2, 58 S.Ct. 630, 82 L.Ed. 917 (1938)). Barring an individual from operating in an industry "do[es] not involve an 'affirmative disability or restraint,' as that term is normally understood" and "is 'certainly nothing approaching the "infamous punishment" of imprisonment.' " *Id.* (quoting *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)).

Nor does consideration of any of the other *Guidry* factors lead to the conclusion that the penal standard for vagueness should apply in the present matter. A violation of the required inspection procedures does not, by the plain language of the inspection procedures and Rule 40, entail a finding of any requisite state of mind, *see* HAR § 19–133.5, *passim.* We are unaware of any indication that the conduct at issue is already considered "criminal" elsewhere in the state's statutes and regulations. While it is arguable that a component of the purpose underlying the revocation procedures is deterrence, they also serve to enforce the inspection procedures, which in turn were promulgated to achieve the stated legislative objective of ensuring that vehicles on the state's highways are "in good working order and adjustment ... so as not to endanger the driver or other occupant or any person upon the highway," HRS § 286–21, *see supra* note 6. The DOT's revocation of a license to inspect in response to a failure to

---

12. HRS § 226–25 provided in relevant part that "any vessel, ... [or] owner ... which violate[s] the rules of the department or this chapter[ ] shall be fined not more than $10,000[.00] *for each violation ....*" (Emphasis added.)

13. The ICA noted that the commentary to HRS § 701–107(5) states that "[s]ubsection (5) creates a class of *non-criminal* offenses, called violations. No imprisonment may follow conviction of a violation, nor may any civil disabilities be imposed." 10 Haw.App. at 231, 864 P.2d at 1115 (emphasis added).

14. HRS § 701–107(5) provides:

> An offense defined by this Code or by any other statute of this State constitutes a violation if it is so designated in this Code or in the law defining the offense or *if no other sentence than a fine, or fine and forfeiture or other civil penalty, is authorized upon conviction* or if it is defined by a statute other than this Code which provides that the offense shall not constitute a crime. *A violation does not constitute a crime,* and conviction of a violation shall not give rise to any civil disability based on conviction of a criminal offense.
> (Emphases added.)

inspect a vehicle with sufficient diligence to ensure that it does not endanger its occupants or others cannot be said to be " 'excessive in relation to the ... purpose,' " *Guidry*, 105 Hawai'i at 236, 96 P.3d at 256 (quoting *Russell*, 124 F.3d at 1084).

Therefore, we hold that the inspection procedures and Rule 40 must be reviewed under the civil test for vagueness articulated in *Gardens at West Maui*, 90 Hawai'i at 343, 978 P.2d at 781.

> 2. *The inspection procedures and Rule 40 were not unconstitutionally vague.*

▮▮▮▮ Neither party challenges the circuit court's COL that the inspection procedures, "in and of themselves, are not vague and indefinite." Rather, the present dispute centers upon whether the presence of Rule 40 rendered the procedures unconstitutionally vague and standardless.

"When a statute is not concerned with criminal conduct or first amendment considerations, the court must be fairly lenient in evaluating a claim of vagueness." *Doe v. Staples*, 706 F.2d 985, 988 (6th Cir.1983) (citing *Exxon Corp. v. Busbee*, 644 F.2d 1030 (5th Cir.1981) ...). As the United States Court of Appeals for the Sixth Circuit explained,

> [T]o constitute a deprivation of due process, [the civil statute] must be "so vague and indefinite as really to be no rule or standard at all." *A.B. Small[,] Co.[ v. Am. Sugar Refining, Co.*], 267 U.S. [233], 239, 45 S.Ct. 295, 69 L.Ed. 589 ... (1925). To paraphrase, uncertainty in this statute is not enough for it to be unconstitutionally vague; rather, it must be substantially incomprehensible. 644 F.2d at 1033.

*Id.* (some citations and brackets omitted) (some brackets added). *See also* Sutherland, *Statutory Construction* § 21.16 (5th ed.) ("Where economic or commercial interests are involved, a lesser standard is utilized for determining vagueness.") (Ci-

tation omitted.); *cf. In re Wall*, 295 N.W.2d 455, 457 (Iowa 1980) (the degree of specificity constitutionally required of noncriminal statutes will vary, depending on "the various interests affected, the purpose underlying the enactment in question and the potential deprivation which could result from its application.").

*Gardens at West Maui*, 90 Hawai'i at 343, 978 P.2d at 781, *quoted in In re Carlsmith*, 113 Hawai'i 236, 245, 151 P.3d 717, 726 (2007). And, as noted, "the Administrative Procedures Act ... precludes judicial reversal or modification of an administrative decision even where affected by error of law ... unless substantial rights of the petitioner may have been prejudiced." *Survivors of Medeiros v. Maui Land & Pineapple Co.*, 66 Haw. 290, 293, 660 P.2d 1316, 1319 (1983); *see also Paul's Elec. Serv., Inc. v. Befitel*, 104 Hawai'i 412, 421 n. 11, 91 P.3d 494, 503 n. 11 (2004) (noting the same).

In order to harmonize Rule 40 with the plain language of the inspection procedures and to uphold their overall purpose of improving highway safety,[15] the DOT concluded that visual inspections of individual components could be substituted for diagnostic testing where applicable and that a vehicle could be certified upon the general appearance of those components taken *in toto*. If all components appeared physically sound *or* functioned properly after physical testing (if such testing were logically required by the nature of the component, *e.g.*, in the case of the horn or brakes) the inspector could issue a safety certificate to that vehicle. Therefore, an inspector, at a minimum, would be required to inspect visually, *inter alia*, the fuel intake system, the exhaust system, the undercarriage of the vehicle, and various components such as the driver's door window lever or switch to ensure that no clear damage threatened the safe operation of the component and, subsequently, of the vehicle. As Lovstedt noted, to adopt Paul's interpretation would have rendered the entirety of the

---

**15.** Paul does not contest the fact that the purpose of the vehicle safety inspection program is to ensure that the motor vehicles on the state's highways are "in good working order and adjust-

ment ... so as not to endanger the driver or other occupant or any person upon the highway." *See* HRS § 286–21, *supra* note 6.

inspection procedures a nullity.[16] Such a result would clearly conflict with the purpose of enacting the inspection program in the first instance and would adversely affect the safety interests of the motoring public. Rather, the DOT interpreted the specific requirements of the inspection procedures with the general wording of Rule 40 in such a way as to preserve the integrity of the program and further its purpose.

We therefore hold that the DOT's harmonization of the inspection procedures with Rule 40 achieved the underlying purpose of the motor vehicle inspection program and was not so vague as to " 'be substantially incomprehensible' " or " 'so vague and indefinite as really to be no rule or standard at all.' " *Gardens at West Maui*, 90 Hawai'i at 343, 978 P.2d at 781 (quoting *Staples*, 706 F.2d at 988 (quoting *A.B. Small, Co.*, 267 U.S. at 239, 45 S.Ct. 295)).

In any event, Paul fails to establish any prejudice to her substantial rights as required by HRS § 91–14(g), *see* emphasized language *supra* note 3; *see also* discussion *supra* this section. Any contention by Paul that the relevant provisions were unconstitutionally vague on their face and that she was misled by a personal perusal of the inspection procedures and Rule 40 is belied by her concession that she was unaware of Rule 40 until after her inspection license was revoked and she sought the advice of counsel. As for Paul's claim that the DOT's interpretation of the rules was vague and standardless when applied to her, the DOT regulators testified that they informed Paul of the practical requirements of their interpretation of the relevant HAR sections and the actions expected of her when conducting a vehicle inspection, including, at a minimum, the requirement that a visual inspection be conducted of individual components such as the fuel intake system and the suspension. Hanohano and Takimoto both testified that they had repeatedly informed Paul that it was necessary to inspect visually the components of a vehicle by entering the interior, raising the hood,

and inspecting the undercarriage. Moreover, Takimoto testified that the DOT suspended Paul's license to inspect in June 2001, approximately a year before the present revocation, for "the same type of . . . cursory checks, . . . no getting into the vehicle, [no] checking under the hood or under the vehicle for suspension checks." Moreover, in neither the circuit court nor the present appeal did Paul challenge the director's FOF that she had been apprised of the necessity of performing such checks. Nor does she contest the fact that, of the seventy-five infractions found by the director, forty did not involve a failure to conduct physical tests but, rather, a failure to conduct a purely visual inspection of the particular component in question.

In light of the foregoing, we conclude that the DOT's decision was not " 'unjust and unreasonable in its consequences,' " *Konno*, 85 Hawai'i at 77, 937 P.2d at 413 (quoting *Bragg*, 81 Hawai'i at 304, 916 P.2d at 1205), but, rather, was supported by evidence in the record and based upon a valid interpretation of the rules as applied to Paul's conduct.

### IV. CONCLUSION

We therefore vacate the March 18, 2005 judgment on appeal of the circuit court and remand for proceedings consistent with this opinion.

---

**16.** Paul contends that components such as the brakes and the speedometer can be tested by purely visual means to ensure that they are functioning properly, yet she concedes that such an interpretation mocks commons sense and that, in practice, she tests the brakes, at least minimally, by entering the car and depressing the pedal.