209 P.3d 1271

UNITE HERE! LOCAL 5; Eric W. Gill; Todd A.K. Martin, Plaintiffs–Appellees,

v.

CITY AND COUNTY OF HONOLULU, a municipal corporation; Kuilima Resort Company, a Hawaii corporation, Defendants–Appellees,

and

Doe Defendants 1–10, Defendants (Civil No. 06–1–0265).

Kuilima Resort Company, a Hawaii general partnership, Counterclaim Plaintiff–Appellee,

v.

Unite Here! Local 5 Hawaii, a Hawaii labor partnership; Eric W. Gill, an individual, Counterclaim Defendants–Appellees.

Kuilima Resort Company, a Hawaii general partnership, Counterclaim Plaintiff–Appellee,

v.

Unite Here!, a New York labor organization, Additional Counterclaim Defendant–Appellee,

and

Doe Defendants 1–10, Additional Counterclaim Defendants.

Keep The North Shore Country, a Hawaii non-profit corporation; and Sierra Club, Hawaii Chapter, a foreign non-profit corporation, Plaintiffs–Appellants,

v.

City and County of Honolulu; Henry Eng, Director of Department of Planning and Permitting, in his official capacity; Kuilima Resort Company, a Hawaii general partnership, Defendants–Appellees,

and

John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Doe Entities 1–10; and Doe Governmental Units 1–10, Defendants (Civil No. 06–1–0867).

No. 28602.

Intermediate Court of Appeals of Hawai'i.

May 22, 2009.

Rory R. Wicks of Coast Law Group LLP (admitted pro hac vice) (William S. Hunt, Laura P. Couch, and Blake K. Oshiro of Alston Hunt Floyd & Ing, Honolulu, and Marco A. Gonzalez of Coast Law Group LLP (admitted pro hac vice) with him on the briefs), for Plaintiffs–Appellants.

Sharon V. Lovejoy of Starn O'Toole Marcus & Fisher (Terence J. O'Toole, Lane Hornfeck; Wil K. Yamamoto, and Shyla P.Y. Cockett of Starn O'Toole Marcus & Fisher, with her on the brief), Honolulu, for Defendant–Appellee Kuilima Resort Company.

Don S. Kitaoka, Deputy Corporation Counsel, City and County of Honolulu (Lori K.K. Sunakoda, Deputy Corporation Counsel, City and County of Honolulu with him on the brief) for Defendants–Appellees City and County of Honolulu and Henry Eng.

Pamela W. Bunn, Lindsey Kasperowicz, and Ronald N.W. Kim of Paul Johnson Park & Niles, Honolulu, on the brief, for amicus curiae Conservation Council for Hawai'i.

WATANABE, Acting C.J., and FOLEY, J.; and NAKAMURA, J., dissenting.

## Opinion of the Court by FOLEY, J.

Plaintiffs–Appellants Keep the North Shore Country (KNSC), a Hawai'i non-profit corporation, and Sierra Club, Hawai'i Chapter (Sierra Club), a foreign non-profit corporation, (collectively, Plaintiffs) appeal from the Amended Final Judgment filed on June 4, 2007 in the Circuit Court of the First Circuit[1] (circuit court). The circuit court entered judgment in favor of Defendants–Appellees City and County of Honolulu (CCH); Henry Eng (Eng), Director of Department of Planning and Permitting (DPP), in his official capacity; and Kuilima Resort Company (Kuilima), a Hawai'i general partnership, (collectively, Defendants) and against Plaintiffs on all of Plaintiffs' claims as set forth in their First Amended Complaint.

On appeal, Plaintiffs contend the circuit court erred in granting Kuilima's Third Motion for Summary Judgment and denying Plaintiffs' Motion for Summary Judgment.

## I.

In the 1980's, Kuilima's predecessor in interest, Kuilima Development Company (KDC), owned a resort on the North Shore of the Island of O'ahu. The resort consisted of a 487–room hotel and an 18–hole golf course. KDC proposed the Kuilima Resort Expansion (Project), which would involve expansion of the existing hotel and new construction of three hotels for a total of 1,450+ new units; renovation of the existing 18–hole golf course; and new construction of 2,060+ condominium units, a 70,000+ sq. ft. commercial complex, an 18–hole golf course and clubhouse, a tennis center, and an equestrian center. The Project also called for infrastructure and public improvements, including a new wastewater treatment plant, a production water well, a standby well, a new reservoir, new water distribution lines, improvements to the portion of Kamehameha Highway fronting the resort, two private and two public beach parks, a wildlife preserve that included virtually all of Punahoo-lapa Marsh, and public rights-of-way to the shoreline.

### A. Environmental Impact Statement (EIS)

In connection with the Project, Kuilima published an EIS Notice of Preparation in the Office of Environmental Quality Control (OEQC) Bulletin on November 8, 1983, seeking comments to aid in the preparation of a Draft EIS. The Draft EIS was filed with the OEQC on August 5, 1985 and published in the OEQC Bulletin on August 8, 1985. Comments to the Draft EIS were used in the preparation of the Revised EIS, which was submitted to the DPP's predecessor, the Department of Land Utilization (DLU), on October 7, 1985.

The Revised EIS identified additional traffic as one of the unavoidable environmental effects of the Project's development and included a traffic study prepared by a company retained by Kuilima. The traffic study examined the traffic conditions that would be caused by an increase in visitors to the region, with projections through the year 2000. Access to the Project would be via Kamehameha Highway, a two-lane, two-way, undivided state highway that serves as the only arterial highway on O'ahu's North Shore. The study concluded that "[w]hile the increased traffic generated by the proposed resort expansion is significant when compared to the projected background conditions, it is not beyond the carrying capacity of an upgraded, high quality two-lane arterial."

The Revised EIS mentioned a potential impact on green sea turtles, a "threatened" species under the federal Endangered Species Act, when discussing the desilting of Kawela Bay (which borders on the Project). It noted that the desilting would be located "across the area where the abundant growths of algae that are known to be important diet items of [green sea turtles] are found." The Revised EIS did not mention any anticipated impact upon the Hawaiian monk seal, an "endangered" species under the Endangered Species Act.

1. The Honorable Sabrina S. McKenna presided.

At the time the Revised EIS was prepared, the Project was to be developed in three phases, with phase I starting in 1986, phase II starting between 1988 and 1989, and phase III starting between 1993 and 1996. The DLU accepted the Revised EIS on October 30, 1985.

## B. Initial Approvals and Delays in the Project's Development

The Revised EIS listed additional governmental approvals KDC needed to obtain in order to complete development of the Project, including rezoning approval from the DLU, grading and building permits, a shoreline certification, a Special Management Area Use Permit, and subdivision approval.

On March 27, 1986, the Land Use Commission approved the reclassification of 236 acres of the property from Agriculture District to Urban District for resort and golf course uses.

On May 23, 1986, the DLU accepted KDC's application for a Special Management Area Use Permit and Shoreline Setback Variance. KDC sought to expand its resort by developing a master-planned resort community that would include hotels, dwellings, commercial areas, golf courses, parks, roadways; to replace two drainage culverts with open channels; and to conduct a desilting operation at Kawela Bay.

On June 25, 1986, a bill for an ordinance to rezone certain portions of the property to be developed under the Project was introduced before the CCH City Council (City Council). The bill incorporated the Unilateral Agreement and Declaration for Conditional Zoning (Unilateral Agreement), in which KDC agreed that the zoning change would be subject to conditions requiring, among other things, construction of a wastewater treatment plant, construction of low-to-moderate-income housing, improvements and modifications to roadways, the implementation of a shuttle service, and the establishment of a child care center, parks, public easements to and along the shoreline, and public parking. Like the Revised EIS, the Unilateral Agreement anticipated development to proceed in three phases, the last phase to be completed before 2000. The Unilateral Agreement not-

ed that development may deviate from the phased development schedule "due to the occurrence of changed economic conditions, lawsuits, strikes or other unforeseen circumstances."

The City Council passed the rezoning bill on August 14, 1986 and approved KDC's application for the Special Management Area Use Permit and Shoreline Setback Variance by resolution adopted on October 1, 1986 (the March 27, 1986; August 14, 1986; and October 1, 1986 approvals are collectively referred to as the Project Entitlements).

Over the next twenty years, only certain aspects of the Project were completed. KDC constructed a wastewater treatment plant and water main between January 1989 and March 1990, the Opana Wells between February 1989 and March 1991, and the Palmer Golf Course between March 1989 and March 1991. Construction of improvements to Punahoolapa Marsh began in approximately March 1990. From 1990 through 1991, KDC obtained subdivision approvals for various parcels to be used for parks, roads, hotels, a golf course, and a golf clubhouse.

In March 1999, Kuilima purchased the property underlying the Project from KDC and KDC assigned its interest in the Project to Kuilima.

In May 1999, the DPP drafted the Koʻolau Loa Sustainable Communities Plan "to help guide public policy, investment, and decision-making through the 2020 planning horizon" in order to maintain and enhance "the region's ability to sustain its unique character, current population, growing, families, lifestyle, and economic livelihood." The plan recognized and supported the Project. The City Council adopted the plan on December 16, 1999.

Kuilima renovated the existing Fazio Golf Course between 2000 and 2002. In 2003, Kuilima obtained approval to renovate and expand existing portions of the Turtle Bay Resort. Between 2003 and 2005, Kuilima invested about $100 million in completing these renovations, which included the addition of nine resort condominium units.

As of November 2005, construction on the major components of the Project, including the hotel rooms and the condominium units, had not begun.

## C. The 2005 Subdivision Application

On November 8, 2005, Kuilima submitted a Site Development Division Master Application Form (Subdivision Application) to the DPP, seeking subdivision approval for approximately 744 acres of its 808-acre property.

In response to the Subdivision Application, the DPP received two letters in January 2006, asking that the DPP require the preparation of a Supplemental EIS (SEIS) before approving the Subdivision Application. In a January 5, 2006 letter, Eric Gill, the treasurer of UNITE HERE! Local 5, asserted that an SEIS was required because twenty years had passed since the Revised EIS and changes had occurred in the "traffic, water availability, hotel and housing needs, endangered species habitat needs, and the like." North Shore resident Ben Shafer submitted a January 6, 2006 letter, stating that "[m]uch had changed since the approval of the [Revised] EIS ... some twenty years ago" and an SEIS needed to be prepared to allow for community input and to address new concerns regarding "[t]ransportation, sewage, housing, water, cultural [issues], [and] the Master Plan for the Koʻolauloa region."

The DPP responded to the Shafer and Gill letters that because no specific time limit had been imposed on the Project at the time of the Project's initial approval, the DPP felt it could not require an SEIS to address changes in the conditions surrounding the Project caused by the passage of time. Although DPP planner James Peirson (Peirson) drafted the January 19, 2006 reply letter to Shafer, the letter was signed by Eng. The DPP's letter to Shafer stated:

> No time frame for development was either implied or imposed by the City Council as part of its approval. *Accordingly, the developer is entitled to proceed with the project as approved.* By not imposing any time limits at the time, the City Council indicated that the project could be developed at its own pace. Further, as a mat-

ter of law, the [CCH] cannot retroactively impose time limits or unilaterally rescind an entitlement like an approved discretionary permit.

(Emphasis added.)

The DPP's reply letter to Gill, dated January 31, 2006, was prepared by DPP planner Mario Siu–Li (Siu–Li) and signed by Eng. The letter explained that an SEIS was not required because as long as Kuilima was following the appropriate subdivision rules and regulations, the CCH was obligated to continue to process the Subdivision Application. The DPP provided Gill a copy of its reply letter to Shafer.

Peirson explained in his deposition that when determining whether to require an SEIS, DPP looked to see if there had been any substantive changes to a project. In his deposition, Siu–Li similarly stated that the reason why the DPP did not require an SEIS for the Project was because "the [S]ubdivision [A]pplication was not changing the existing condition of the properties."

On March 8, 2006, the State of Hawaiʻi Environmental Council heard testimony from members of the North Shore community regarding the SEIS issue. On March 22, 2006, the Environmental Council wrote to the DPP requesting clarification as to why the Project did not require an SEIS considering "the changes in timing since 1985, especially with respect to cumulative impacts and mitigative measures articulated in the original accepted [Revised EIS]." In an April 4, 2006 letter, the Department of Corporation Counsel for CCH responded that the DPP would not comment on the Environmental Council's concerns because the issue of requiring an SEIS had become the subject of litigation.

The Environmental Council sent a follow-up letter to the DPP dated June 14, 2006, expressing the council's concern that the DPP was placing the burden on others to prove an SEIS was required instead of making its own independent determination:

> The Council is concerned that ... DPP has not made an independent determination of whether an SEIS is required. Rather, it appears as though DPP believes that it should not require an SEIS unless

some third party *proves* to DPP that it is required. This does not appear to be correct.

The Environmental Council also stated that based on the information available to it regarding changing environmental conditions in the Project over the last twenty years and changes in the Project's timing and scope, it believed the DPP should require Kuilima to prepare an SEIS for the Project.

As part of its subdivision review process, the DPP circulated Kuilima's Subdivision Application to various interested departments and agencies of CCH and the State of Hawai'i for review, comment, and approval. The State of Hawai'i Department of Transportation (DOT) was among the departments and agencies that reviewed the Subdivision Application. The DOT accepted Kuilima's Roadway Improvements Implementation and Phasing Plan after Kuilima agreed to revise its Traffic Impact Analysis Report to address the DOT's concerns. On September 29, 2006, without requiring an SEIS, the DPP tentatively approved the Subdivision Application.

### D. Proceedings in the Circuit Court

Two civil lawsuits were filed in connection with the DPP's decision not to require an SEIS for the Project.

On February 15, 2006, UNITE HERE! Local 5, Gill, and Todd A.K. Martin filed a complaint against CCH and Kuilima in Civil No. 06–1–0265, seeking declaratory and injunctive relief relating to the lack of an SEIS for the Project.

Plaintiffs filed their complaint on May 19, 2006 and their First Amended Complaint for Declaratory and Injunctive Relief on June 7, 2006, in Civil No. 06–1–0867. Plaintiffs alleged that a substantive change in the timing of the Project had increased the intensity of the Project's environmental impacts and, thus, Kuilima was required to prepare an SEIS for the remaining portions of the Project. Plaintiffs asked the circuit court to (1) order Kuilima to prepare an SEIS updating the Revised EIS before Kuilima proceeded with the dormant portions of the Project; and (2) issue an injunction against any further ground work or construction by Kuilima

relating to the Project until the SEIS had been prepared.

The two lawsuits were consolidated on July 17, 2006. On August 1, 2006, the parties to Civil No. 06–1–0265 stipulated to the dismissal with prejudice of all claims and parties. Thereafter, only the parties and claims in Civil No. 06–1–0867 remained.

On October 11, 2006, Kuilima filed four motions:

1. Motion for Judgment on the Pleadings. Kuilima argued that there is no private right of action under the Hawaii Environmental Policy Act (HEPA) to require an SEIS.

2. First Motion for Summary Judgment. Kuilima argued that Plaintiffs' complaint was barred by the statute of limitations.

3. Second Motion for Summary Judgment. Kuilima argued that its Subdivision Application was exempt from the environmental review process and involved a non-discretionary, ministerial action by the DPP that could not trigger an SEIS.

4. Third Motion for Summary Judgment. Kuilima argued that Plaintiffs could not meet their burden of proving that an SEIS was required under the applicable regulations. Kuilima contended that the applicable regulations should be interpreted to mean that an agency can *only* require an SEIS if there is a substantive change in a project itself which causes significant environmental impacts not addressed in the original EIS. Accordingly, absent evidence that the Project itself had substantively changed, an SEIS could not be triggered based on a showing that new circumstances surrounding the project would result in significant environmental impacts.

Eng and CCH joined in Kuilima's motions, except for Kuilima's Second Motion for Summary Judgment.

On October 26, 2006, Plaintiffs filed a Motion for Summary Judgment, arguing that the DPP had violated the law by failing to require Kuilima to prepare an SEIS.

On December 5, 2006, the circuit court granted Kuilima's Third Motion for Summary Judgment regarding Plaintiffs' inability to meet their burden of proof, denied Plain-

tiffs' Motion for Summary Judgment, and ruled that Kuilima's other motions were rendered moot. The circuit court agreed with Kuilima that the applicable regulations should be interpreted to mean that an agency can require an SEIS only when there is a substantive change in the project itself, and the court found that Plaintiffs had not shown a substantive change in the Project. The circuit court found in relevant part as follows:

4. Although there has been some delay in the Project from the community's perspective, there have been ongoing activities and actions with respect to the Project throughout the past 20 years. In addition, the Project was adopted as part of the Koʻolauloa Sustainable Communities Plan in May of 1999; the public had an opportunity to participate with respect to the adoption of that Plan.

. . . .

6. At the end of 2005 and beginning of 2006, certain North Shore neighborhood boards, Ms. Dee Dee Letts on her own behalf, and other individuals asked the DPP whether the timing of the Project would require [an SEIS]. The Plaintiffs did not write any of those letters. The DPP responded, indicating that it had determined that [an SEIS] was not required for the Project. Although it does not appear that specific reasons were given, the DPP determined that the timing of the action has not changed so as to require [an SEIS].

7. The [Revised] EIS contained only general statements in terms of phasing of the Project, but those statements did not impose a time limit on the Project based on that proposed phasing time frame. The [Revised] EIS does not obligate Kuilima to follow that phasing time frame.

8. The law provides that when you have a project that is to be constructed in phases, the original EIS covers everything, and the project is the action under consideration. In this case, the Project is the "action." There has been no change to the action that would essentially make it a new action under consideration.

The circuit court concluded that:

2. The DPP's decision that [an SEIS] is not required for the Project meets the rule of reason standard and was not arbitrary or capricious. The timing of the Project has not substantively, or essentially, changed. In the alternative, even if the timing had substantively changed, which the Court finds that it has not, such change is not likely to have a significant effect.

3. Plaintiffs' concerns that form the basis of their claims in this litigation were basically expressed for the first time in the filings before this Court. However, even if the Court were to review those concerns, the Court would not find that there is a substantive change likely to result in a significant effect not originally considered or previously dealt with that would require a supplemental EIS.

The circuit court filed the Amended Final Judgment on June 4, 2007, and Plaintiffs timely appealed.

## II.

The circuit court's grant or denial of summary judgment is reviewed de novo. *Querubin v. Thronas,* 107 Hawaiʻi 48, 56, 109 P.3d 689, 697 (2005).

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Querubin,* 107 Hawaiʻi at 56, 109 P.3d at 697 (quoting *Durette v. Aloha Plastic Recycling, Inc.,* 105 Hawaiʻi 490, 501, 100 P.3d 60, 71 (2004)).

## III.

### A. HEPA

HEPA, the governing law, was enacted in 1974, codified as Hawaii Revised Statutes (HRS) Chapter 343, and patterned after the National Environmental Policy Act of 1969 (NEPA). *Sierra Club v. Dep't of Transp.* (*Superferry*), 115 Hawai'i 299, 306, 167 P.3d 292, 299 (2007). HEPA requires that an EIS be prepared for a development project that meets certain criteria. *Id.*

HEPA provides that once an EIS has been accepted, "no other statement for the proposed action shall be required." HRS § 343–5(g) (Supp.2005). HEPA does not specifically address the authority of an agency to require an SEIS.

### B. HEPA and Applicable Rules

This appeal turns on the interpretation of HEPA and the rules promulgated by the Environmental Council regarding the circumstances under which an agency is required to order an SEIS. Pursuant to its rule-making authority set forth in HRS § 343–6 (1993), the Environmental Council promulgated Hawaii Administrative Rules (HAR) Title 11, Chapter 200.

HAR § 11–200–2 defines the term "supplemental statement" as meaning "an additional environmental impact statement prepared for an action for which a statement was previously accepted, but which has since changed substantively in size, scope, intensity, use, location, or timing, among other things." The term "action" is defined in HAR § 11–200–2 to mean "any program or project to be initiated by an agency or applicant." HAR §§ 11–200–26 and 11–200–27 establish when an SEIS is required.

Plaintiffs contend these rules mean that an SEIS must be prepared in three separate situations: (1) "[w]hen there is a substantive change in a project's size, scope, location, use, timing, mitigation, and other things which may have a significant effect"; or (2) "[w]hen there is a substantive change in the intensity of environmental impacts caused by the project not disclosed in the EIS"; or (3) "[w]here new circumstances or evidence have brought to light different or likely increased environmental impacts not previously disclosed or dealt with in the EIS."

Kuilima and the DPP, on the other hand, contend that the rules only permit an agency to order an SEIS if substantive changes to the project itself have been made. In Kuilima's words:

> In short, [the applicable regulations] require an initial determination of a substantive change in the Project *before* the environmental impacts are considered in determining whether an SEIS is required. Neither increased environmental impacts nor new circumstances or evidence alone, without a substantive change in the Project, is sufficient to require an SEIS.

(Emphasis in original; footnote omitted.)

 Kuilima and the DPP argue that because there was no substantive change in the Project itself, the DPP correctly determined that it could not require Kuilima to prepare an SEIS. Plaintiffs argue that because the DPP misconstrued the regulations, the DPP failed to take a hard look at whether an SEIS was required by new circumstances and evidence and thus DPP's decision cannot stand.

Kuilima and the DPP point to the language of HAR § 11–200–26, which provides:

> **§ 11–200–26. General provisions.** A statement that is accepted with respect to a particular action is usually qualified by the size, scope, location, intensity, use, and timing of the action, among other things. A statement that is accepted with respect to a particular action shall satisfy the requirements of this chapter and *no other statement for that proposed action shall be required, to the extent that the action has not changed substantively* in size, scope, intensity, use, location or timing, among other things. If there is any change in any of these characteristics which may have a significant effect, the original statement that was changed shall no longer be valid because an essentially different action would be under consideration and a supplemental statement shall be prepared and reviewed as provided by this chapter. *As long as there is no change in a proposed action resulting in individual or cumula-*

*tive impacts not originally disclosed, the statement associated with that action shall be deemed to comply with this chapter.* (Emphases added.)

Under the plain terms of HAR § 11–200–26, the DPP is required to conduct a two-step inquiry to determine whether an SEIS is required:

(1) *Whether the action (the Project) has changed substantively* in size, scope, intensity, use, location or timing? *And if so,*

(2) Will the change in any of these characteristics likely have a significant effect and result in individual or cumulative impacts not originally disclosed in the EIS?

If the DPP answers the first question in the negative, no further inquiry is necessary as "no other statement [for the Project] will be required." *Id.* If the DPP answers the first question in the affirmative (i.e., finding there is a substantive change in one of the aforementioned characteristics), then the DPP is required to determine whether the change will likely have a "significant effect" and result in "individual or cumulative impacts not originally disclosed" in the original EIS. *Id.*

The requirement that there be a change in the action is further made clear by HAR § 11–200–2: " 'Supplemental statement' means an additional environmental impact statement prepared for an *action* for which a statement was previously accepted, but *which has since changed substantively.*" (Emphases added.)

HAR § 11–200–27, which provides further specifics for determining if an SEIS is required, also requires the threshold determination of a substantive change:

§ 11–200–27. **Determination of applicability.** The accepting authority or approving agency in coordination with the original accepting authority shall be responsible for determining whether a supplemental statement is required. This determination will be submitted to the office for publication in the periodic bulletin. Proposing agencies or applicants shall prepare for public review supplemental state-ments *whenever the proposed action* for which a statement was accepted *has been modified to the extent that new or different environmental impacts are anticipated.* A supplemental statement shall be warranted when the scope of an action has been substantially increased, when the intensity of environmental impacts will be increased, when the mitigating measures originally planned are not to be implemented, or where new circumstances or evidence have brought to light different or likely increased environmental impacts not previously dealt with.

(Emphases added.) The last sentence—on which Plaintiffs rely—identifies new or different environmental impacts that would warrant an SEIS, but does not change the requirement as set forth in HAR §§ 11–200–2 and 11–200–26 and the next-to-last sentence of § 11–200–27 that there *must be a substantive change* in the action (the Project) before an SEIS is to be considered.

No other reading of the rules is possible. HRS § 343–5(g) provides that once an EIS has been accepted, no other statement for the proposed action shall be required. Because the rules must be consistent with HRS § 343–5(g), the rules cannot be construed to require an additional SEIS unless there has been a substantive change in the action. *Capua v. Weyerhaeuser Co.,* 117 Hawai'i 439, 446, 184 P.3d 191, 198 (2008).

C. **Plaintiffs' Misplaced Reliance on NEPA and the California Environmental Quality Act (CEQA)**

Plaintiffs argue that NEPA and CEQA support their contention that an SEIS is required when there is a change in the intensity of environmental impacts or there are new circumstances or evidence. The plain language of the federal regulations and California's regulations is different from that of Hawai'i's SEIS rules. Moreover, NEPA is limited to federal actions or federally funded actions.

The NEPA regulation, 40 C.F.R. § 1502.9, provides in relevant part that agencies:

(1) Shall prepare supplementals to either draft or final environmental impact statements if:

(i) The agency makes *substantial changes* in the proposed action that are relevant to environmental concerns; *or*

(ii) There are *significant new circumstances* or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(Emphases added.)

California's regulation, CEQA § 21166, provides:

§ 21166. **Subsequent or supplemental impact report; conditions.** When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless *one or more of the following events occurs:*

(a) *Substantial changes are proposed* in the project which will require major revisions of the environmental impact report.

(b) *Substantial changes occur* with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

(c) *New information,* which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available.

Cal. Pub. Res.Code § 21166 (2007) (emphases added).

Unlike Hawai'i's SEIS rules that require an SEIS when there is a substantive change in the project or action, NEPA and CEQA § 21166 require an SEIS when there are substantial changes *or* significant new circumstances *or* information relevant to the project and action.

**D. Plaintiffs' Failure to Show a Substantive Change in the Project**

Plaintiffs' only allegation in the circuit court of a "change" in the Project was an alleged change in "timing." Plaintiffs argue that increased traffic, other planned developments near the Project, and the existence of endangered or threatened species constitute "new circumstances or evidence." However, these are not substantive changes in the Project.

When asked what information they had about changes in the Project, each of Plaintiffs' deposition witnesses admitted they had no personal knowledge or evidence of changes in the Project, with the exception of their claim regarding timing.

When asked what change sufficient to require an SEIS had occurred, Schuyler "Lucky" Cole, KNSC's treasurer, responded with the economics of and employment in the area, the striker brigade, Kapolei as a second city, the development of Ko Olina, traffic in the area, and the appearance of monk seals in the area. However, Mr. Cole could produce no actual evidence of these changes, let alone a change to the Project. Similarly, Sierra Club Director Jeff Mikulina admitted that he did not know of any changes in the Project's scope, intensity, or use, stating "[y]eah, I don't remember being too aware of the change in the size itself of the [P]roject.... I know some things are moving around. I don't know how the scope has changed in the [P]roject.... Again, I don't know enough about the most recent iteration of the [P]roject to see how [the intensity of the Project has] changed." Douglas Cole, a Director of KNSC, stated that he believed that currently there were "far more" cars and people coming to the North Shore than in 1984–85 and "based on personal experience and just observation," it took "a lot longer" to drive along the North Shore.

Plaintiffs confirmed in their answers to interrogatories that they had no specific evidence of a change in the Project. The Revised EIS detailed only an "approximate phasing of the development for the resort." Neither the Revised EIS nor the governmental entities imposed a timing condition.

The record in this case demonstrates there was no substantial change in the Project. This was the conclusion of the DPP, the

agency responsible for determining whether the SEIS was required.[2]

### E. Kuilima's Subdivision Application Not an "Action" Under HEPA

■ Contrary to Plaintiffs' contention, the Subdivision Application did not constitute an "action" under HEPA. HRS § 343–2 (Supp. 2008) defines "action" as "any program or project to be initiated by an agency or applicant." *See also* HAR § 11–200–2. The Revised EIS covered the entire Project, including the Subdivision Application.

Consideration of HAR § 11–200–7 is a preliminary step in defining an "action" under HEPA. *Superferry,* 115 Hawai'i at 306 n. 6, 167 P.3d at 299 n. 6. HAR § 11–200–7 provides:

> § 11–200–7. **Multiple or phased applicant or agency actions.** A group of actions proposed by an agency or an applicant shall be treated as a single action when:
>
> (1) The component actions are phases or increments of a larger total undertaking;
>
> (2) An individual project is a necessary precedent for a larger project;
>
> (3) An individual project represents a commitment to a larger project; or
>
> (4) The actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole.

The Project was not in the first stages of development, and the Subdivision Application was not the start of the Project. A Revised EIS had already been completed, and Project Entitlements had been granted. Kuilima had applied for and received numerous subdivision approvals as part of the Project development, including subdivision approvals for (1) the Project's wastewater treatment plant and Opana Wells; (2) public park P–1; (3) hotel lots H–1 and H–2 and roads A and B; and (4) the golf clubhouse.

■ The purpose of HAR § 11–200–7 is to prevent the pursuit of "projects in a piecemeal fashion." *Superferry,* 115 Hawai'i at 338, 167 P.3d at 331. "Piecemealing" or "segmentation" occurs when a party tries to "mask the full nature of [the] project or divides up what is clearly a larger action into smaller pieces." Plaintiffs' argument that the Subdivision Application is the "action" is piecemealing. Kenneth A. Manaster & Daniel P. Selmi, 2 *State Environmental Law* § 13.10 (2006).

Plaintiffs argue that the Subdivision Application proposes "uses within a shoreline area" and thus, under HRS § 343–5(a) (1993 & Supp.2005) and Att. Gen. Op. 75–14, should be considered an "action." Plaintiffs, however, are wrong. HRS § 205A–41 (2001 Repl.) defines the "shoreline area" as "all of the land area between the shoreline and the shoreline setback line." [3] The shoreline setback line is defined as "that line established in this part ... running inland from the shoreline at a horizontal plane." HRS § 205A–41.

Plaintiffs point to nothing in the record evidencing that the Subdivision Application proposes "any use within a shoreline area as defined in section 205A–41," as required in HRS § 343–5(a)(3). Plaintiffs fail to establish that all three elements were present in the Subdivision Application thereby making the Subdivision Application an "action" that requires an SEIS.

### IV.

Therefore, the Amended Final Judgment filed on June 4, 2007 in the Circuit Court of the First Circuit is affirmed.

---

2. The Environmental Council agreed that "the responsibility for requiring an SEIS falls squarely on the approving agency, which is DPP."

3. HRS § 205A–41 provides:

§ 205A–41 **Definitions.**

. . . .

"Shoreline area" shall include all of the land area between the shoreline and the shoreline setback line and may include the area between mean sea level and the shoreline; provided that if the highest annual wash of the waves is fixed or significantly affected by a structure that has not received all permits and approvals required by law or if any part of any structure in violation of this part extends seaward of the shoreline, then the term "shoreline area" shall include the entire structure.

468

Dissenting Opinion by NAKAMURA, J.

I respectfully dissent.

I interpret the controlling statute and administrative rules to require the preparation of a supplemental environmental impact statement (SEIS) when significant changes to the anticipated environmental impacts of a proposed action become apparent such that "an essentially different action" is being proposed. Significant changes to the anticipated environmental impacts of a development project can arise from changes to the design of the project itself, changes to conditions surrounding the project, or the discovery of new information. In my view, the controlling statute and administrative rules do not restrict the responsible agency by only permitting it to consider changes to a project's anticipated environmental impacts when the design of the project itself has changed. Rather, in determining whether an SEIS is warranted, I believe the agency is authorized to consider not only the potential effects of design changes to the project, but whether changes to the conditions surrounding the project and newly discovered information may significantly affect the project's anticipated environmental impacts.

In this case, the Department of Land Utilization (DLU), the predecessor to the Department of Planning and Permitting (DPP), of the City and County of Honolulu accepted an environmental impact statement (EIS) for the proposed development project in 1985 (hereinafter, the "1985 EIS"). Due to significant delays, construction on major portions of the proposed project had still not begun over twenty years later. In November 2005, the developer submitted a Site Development Division Master Application (hereinafter the "Subdivision Application") to the DPP, seeking subdivision approval with respect to 744 of the 808 acres underlying the project. In January 2006, concerned individuals requested that the DPP require the preparation of an SEIS in connection with the developer's request for subdivision approval. Given the twenty-year passage of time since the acceptance of the 1985 EIS, it was not implausible that conditions in the community surrounding the project had changed to such an extent that the anticipat-

ed environmental impacts from the project were significantly different from those considered in the 1985 EIS. However, the DPP erroneously believed that because the design of the project itself had not changed, it had no legal authority to order an SEIS. Thus, in declining to order an SEIS, the DPP never considered whether changed conditions surrounding the project had significantly affected the proposed project's anticipated environmental impacts.

The DPP is responsible in the first instance for exercising its informed judgment in deciding whether an SEIS is warranted. Because the DPP failed to consider relevant factors in declining to order an SEIS, its decision-making was flawed. The usual remedy in this situation is to return the question of whether an SEIS is required to the DPP for its determination under the appropriate criteria. In my view, the Circuit Court of the First Circuit (circuit court) erred in granting the Third Motion for Summary Judgment filed by Defendant–Appellee Kuilima Resort Company (Kuilima) based on the current record. I would vacate the circuit court's Amended Final Judgment (Judgment) and remand the case for further proceedings.

I.

The governing statute in this case is Hawaii Revised Statutes (HRS) Chapter 343, commonly referred to as the Hawai'i Environmental Policy Act (HEPA). The legislative findings on which HEPA is based and its purpose are as follows:

The legislature finds that the quality of humanity's environment is critical to humanity's well being, that humanity's activities have broad and profound effects upon the interrelations of all components of the environment, and that *an environmental review process will integrate the review of environmental concerns with existing planning processes of the State and counties and alert decision makers to significant environmental effects which may result from the implementation of certain actions.* The legislature further finds that the process of reviewing environmental effects is desirable because environmental consciousness is enhanced, cooperation and

coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole.

It is the purpose of this chapter *to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making* along with economic and technical considerations.

HRS § 343–1 (1993) (emphases added).

In *Sierra Club v. Department of Transportation*, 115 Hawai'i 299, 167 P.3d 292 (2007) (hereinafter *"Superferry I"*), the Hawai'i Supreme Court quoted from a publication of the Office of Environmental Quality Control (OEQC) which described HEPA as follows:

> the law requires that government give systematic consideration to the environmental, social and economic consequences of proposed development projects prior to allowing construction to begin. The law also assures the public the right to participate in planning projects that may affect their community.

*Id.* at 306, 167 P.3d at 299 (quoting OEQC, State of Hawai'i, *A Guidebook for the Hawaii State Environmental Review Process* 6 (2004)).

As defined in HRS § 343–2 (1993),

> "[e]nvironmental impact statement" or "statement" means an informational document prepared in compliance with the rules adopted under section 343–6 and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic and social welfare of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.[1]

HRS § 343–5(g) (1993), in turn, provided that "[a] statement that is accepted with respect to a particular action shall satisfy the requirements of this chapter and no other statement for that proposed action shall be required."[2]

The evident purpose of HRS § 343–5(g) is to provide a degree of finality in the environmental review process. It addresses the concern, particularly of private parties, that repeated requests for EISes and requiring the preparation of multiple EISes could create uncertainty and undue delay in completing a proposed project. Thus, HRS § 343–5(g) provides that if an EIS is accepted for a particular action, no other EIS for that proposed action shall be required.

Consistent with the purpose of HRS § 343–5(g), the Environmental Council has adopted rules which limit the circumstances under which an SEIS can be ordered to where "an essentially different action" is under consideration. This imposes a relatively high threshold. Only changes in the anticipated environmental impacts of the proposed action that are significant enough to render it "an essentially different action" for purposes of HEPA are sufficient to trigger the need for an SEIS.

The rules adopted by the Environmental Council for when an SEIS is required, Hawai'i Administrative Rules (HAR) §§ 11–200–26 and 11–200–27, are as follows:

§ 11–200–26. General Provisions.

A statement that is accepted with respect to a particular action is usually qualified by the size, scope, location, intensity, use, and timing of the action, among other things. A statement that is accepted with respect to a particular action shall satisfy the requirements of this chapter and no other statement for that proposed action shall be required, to the extent that the action has not changed substantively in size, scope, intensity, use, location or timing, among other things. *If there is any change in any of these characteristics which may have a significant effect, the original state-*

---

1. In 2000, the definition of "environmental impact statement" or "statement" in HRS § 343–2 (1993) was amended by changing the phrase "effects of a proposed action on the economic and social welfare of the community and State" to read "effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State." 2000 Haw. Sess. Laws Act 50, § 2 at 93.

2. In 2004, HRS § 343–5(g) (1993) was amended with only minor grammatical changes being made. 2004 Haw. Sess. Laws Act 55, § 3 at 284.

*ment that was changed shall no longer be valid because an essentially different action would be under consideration and a supplemental statement* [3] *shall be prepared and reviewed as provided by this chapter.* As long as there is no change in a proposed action resulting in individual or cumulative impacts not originally disclosed, the statement associated with that action shall be deemed to comply with this chapter.

§ 11–200–27. Determination of Applicability.

The accepting authority or approving agency in coordination with the original accepting authority shall be responsible for determining whether a supplemental statement is required. This determination will be submitted to the office for publication in the periodic bulletin. Proposing agencies or applicants shall prepare for public review supplemental statements whenever the proposed action for which a statement was accepted has been modified to the extent that new or different environmental impacts are anticipated. *A supplemental statement shall be warranted when the scope of an action has been substantially increased, when the intensity of environmental impacts will be increased, when the mitigating measures originally planned are not to be implemented, or where new circumstances or evidence have brought to light different or likely increased environmental impacts not previously dealt with.*

(Emphases added.)

By limiting the required preparation of an SEIS to situations where "an essentially different action" is under consideration, the rules strike a reasonable balance between the overarching purpose of HEPA to ensure that "environmental concerns are given appropriate consideration in decision making" and the purpose of HRS § 343–5(g) to provide a degree of finality and avoid undue delay in the environmental review process. The question critical to this appeal is how to determine, under the applicable rules, when "an essentially different action" is under consideration. On this question, the rules are not a model of clarity.

## II.

Defendants–Appellees Kuilima, the City and County of Honolulu (the City), and Henry Eng (Eng), in his official capacity as Director of the DPP,[4] argue that the administrative rules provide that an agency has no authority to order an SEIS unless substantive changes have been made to the design of the project itself. They further argue that even if this threshold condition is met, the agency can only order an SEIS if the environmental impacts flowing from the substantive changes in the project are significant and were not disclosed in the previously accepted EIS. There is language in the Environmental Council's rules, particularly in HAR § 11–200–26, that lend support to Kuilima's and the City's argument.

On the other hand, the last sentence of HAR § 11–200–27 supports the position of Plaintiffs–Appellants Keep the North Shore Country and the Sierra Club, Hawai'i Chapter (collectively, the "Plaintiffs") that an agency's authority to order an SEIS is not limited to situations where substantive changes to the project's design have been made. This sentence provides, in relevant part, that "[a] supplemental statement shall be warranted ... when the intensity of environmental impacts will be increased ... or where new circumstances or evidence have brought to light different or likely increased environmental impacts not previously dealt with." HAR § 11–200–27. This portion of HAR § 11–200–27 supports the view that different or increased environmental impacts unrelated to design changes in the proposed project itself can create "an essentially dif-

---

3. HAR § 11–200–2 defines the term "supplemental statement" as follows:

"Supplemental statement" means an additional environmental impact statement prepared for an action for which a statement was previously accepted, but which has since changed

substantively in size, scope, intensity, use, location, or timing, among other things.

4. Defendants–Appellees the City and Eng filed a joint answering brief. Arguments or claims made by the City and Eng will be attributed to the City in this dissenting opinion.

ferent action" and trigger the need for an SEIS.

At minimum, the rules are ambiguous. "In construing an administrative rule, general rules of statutory construction are applicable." *Paul v. Dep't. of Transp.*, 115 Hawai'i 416, 426, 168 P.3d 546, 556 (2007) (citation and brackets omitted). "Where the words of a law are ambiguous: ... The reason and spirit of the law, and the cause which induced the legislature to enact it, may be considered to discover its true meaning." HRS § 1–15(2) (1993) (format changed); *see Paul*, 115 Hawai'i at 426, 168 P.3d at 556 (indicating that administrative rules, like statutes, must be "construe[d] ... in a manner consistent with its purpose").

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> ... When [an administrative] rule does not conflict with statutory and constitutional requirements, courts will ascertain and effectuate the intent of the agency which promulgated the rule. Courts strive to give meaning to all parts of an administrative rule and to avoid construing any part as superfluous. Courts will not construe rules in a manner which produces an absurd result.

*Paul*, 115 Hawai'i at 426–27, 168 P.3d at 556–57 (citations, quotation marks, and ellipses omitted; format changed).

The rules at issue were promulgated by the Environmental Council pursuant its statutory authority to "adopt ... necessary rules for the purposes of [HEPA]." HRS § 343–6 (1993). When viewed in the light of the reason for and spirit of HEPA, I cannot agree with the restrictive reading of the rules proposed by Kuilima and the City.

The overriding purpose of HEPA is to ensure that an agency is provided with relevant information about the environmental impacts of a proposed project so that the agency can make informed decisions about the project. *See* HRS § 343–1. Given this purpose, there is no logical reason to distinguish between significant changes to the anticipated environmental impacts of a development project that arise from changes to the design of the project itself, changes to conditions surrounding the project, or the discovery of new information. The agency must be apprised of and consider significant changes to the project's anticipated environmental impacts, regardless of the source of or basis for such changes, in order to make informed decisions.

A proposed project can become "an essentially different action" in terms of its environmental impacts due to changed circumstances surrounding the project or the discovery of new information, even if the project's design has not changed. Because the focus of HEPA is to achieve informed decision-making based on a clear understanding of a project's environmental impacts, I believe it would be incongruous to preclude an agency from ordering an SEIS to address significant changes to the anticipated environmental impacts of a proposed project simply because the design of the project itself had not changed. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 370–74, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).[5]

---

5. HEPA was patterned after the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321–4370(f) (2000). *See Superferry I*, 115 Hawai'i at 306, 167 P.3d at 299. In *Marsh*, 490 U.S. at 370–74, 109 S.Ct. 1851, the United States Supreme Court held that the authority to require an SEIS was implicit under NEPA. The Court's reasoning is instructive:

> The subject of postdecision supplemental environmental impact statements is not expressly addressed in NEPA. Preparation of such statements, however, is at times necessary to satisfy [NEPA's] "action-forcing" purpose. NEPA

does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to "prevent or eliminate damage to the environment and biosphere" by focusing Government and public attention on the environmental effects of proposed agency action. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct. Similarly, the broad dissemination of information mandated by NEPA permits the public and other govern-

An interpretation of the Environmental Council's rules that would only permit an agency to require an SEIS when the design of a project had substantively changed could lead to absurd results. *See* HRS § 1–15(3) ("Every construction which leads to an absurdity shall be rejected."). Assume, for example, that after the 1985 EIS was approved for Kuilima's proposed project, a devastating hurricane drastically changed conditions in the surrounding community and the community's capacity to accommodate additional visitors and residents. Under Kuilima's and the City's interpretation of the rules, as long as no substantive changes were made to the design of the proposed project, the DPP would be powerless to require an SEIS to address the project's significantly different environmental impacts resulting from the changed circumstances. In addition, according to Kuilima and the City, absent a design change to the project, the DPP would likewise be powerless to order the preparation of an SEIS even if the discovery of new information or evidence brings to light significant environmental impacts that had not previously been disclosed.

Moreover, under Kuilima's and the City's interpretation of the applicable rules and circumstances, because no specific deadline was established for the project's completion, the 1985 EIS would remain valid in perpetuity and no SEIS could ever be required, so long as no substantive changes to the design of the project were made.

I recognize that there is a tension between the need to ensure that an agency is apprised of relevant environmental impacts so that it can make informed decisions and the need for finality in an agency's decision-making. The United States Supreme Court noted that under NEPA,

> an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated

information only to find the new information outdated by the time a decision is made.

*Marsh,* 490 U.S. at 373, 109 S.Ct. 1851. Similarly, under HEPA, not every delay in a project will support a claim that circumstances surrounding the project have changed to such an extent that an SEIS is warranted.

In my view, the Environmental Council's rules address this tension by imposing a relatively high threshold for when an SEIS will be required. I construe the rules to mean that an SEIS is required when new circumstances or evidence reveal significant changes in the anticipated environmental impacts of the proposed action that were not addressed in the original EIS that was accepted. In order to trigger the obligation to prepare an SEIS, the unaddressed environmental impacts must be significant enough that "an essentially different action" would be under consideration. I believe this is a more reasonable interpretation of the rules than one that would impose an absolute bar on an agency's authority to order an SEIS unless substantive changes were made to the project's design.

My interpretation of the applicable rules is supported by provisions of parallel federal and state law. NEPA regulations and the California Environmental Quality Act (CEQA) provide that the obligation to prepare an SEIS can be triggered not only by significant changes to the project itself, but by significant changes to circumstances surrounding the project or new information. Under NEPA regulations, an agency must prepare an SEIS whenever "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; *or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.*" 40 C.F.R. § 1502.9(c)(1) (emphasis added) (format

---

ment agencies to react to the effects of a proposed action at a meaningful time. *It would be incongruous with this approach to environmental protection, and with [NEPA's] manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once*

*unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval.*

*Id.* at 370–71, 109 S.Ct. 1851 (citations and footnotes omitted) (emphasis added).

changed). Similarly, the California Environmental Quality Act provides:

> When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:
>
> (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.
>
> (b) *Substantial changes occur with respect to the circumstances under which the project is being undertaken* which will require major revisions in the environmental impact report.
>
> (c) *New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available.*

Cal. Pub. Res.Code § 21166 (2007) (emphases added).

### III.

Whether an agency has followed correct procedures or considered appropriate factors in making determinations under HEPA is a question of law subject to de novo review. *See Superferry I*, 115 Hawai'i at 317, 167 P.3d at 310. An agency is required to take a "hard look" at relevant environmental factors in determining whether an SEIS is required, and courts apply the "rule of reason" in reviewing such determinations. *See Price v. Obayashi Hawaii Corp.*, 81 Hawai'i 171, 182 & n. 12, 914 P.2d 1364, 1375 & n. 12 (1996) (applying the rule of reason in reviewing an agency's determination that an EIS was sufficient); *Superferry I*, 115 Hawai'i at 342, 167 P.3d at 335 (stating that the court must ensure that the agency has taken a hard look at environmental factors when the agency determines that an action is exempted from the requirements of HEPA); *Marsh*, 490 U.S. at 373–74, 109 S.Ct. 1851 (concluding that in deciding whether an SEIS is required under NEPA, an agency must take a hard look at the environmental effects of its planned action, even after an initial EIS has been approved). "If the agency has followed the proper procedures, its action will only be set aside if the court finds the action to be 'arbitrary and capricious,' given the known environmental consequences." *Price*, 81 Hawai'i at 182 n. 12, 914 P.2d at 1375 n. 12 (quoting *Stop H–3 Ass'n v. Lewis*, 538 F.Supp. 149, 159 (D.Haw.1982)); *see Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 (stating that in examining "whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment' " (citation omitted)).

In response to Kuilima's request for subdivision approval in November 2005, the DPP received letters in January 2006 from Eric Gill, a union officer, and Ben Shafer, a North Shore resident. The letters requested the preparation of an SEIS based on concerns that the anticipated environmental impacts of the proposed project had significantly changed in the twenty years that had elapsed since the 1985 EIS had been accepted. On appeal, Plaintiffs argue that two new circumstances have arisen since the 1985 EIS was accepted that require the preparation of an SEIS: 1) increased traffic resulting in "traffic gridlock" on the North Shore on Kamehameha Highway, the sole access road to the proposed development, during Saturday afternoons, holidays, periods of high surf, and special events; and 2) the use of beaches in the proposed development by Hawaiian monk seals, an endangered species, and green sea turtles, a threatened species.

There is no evidence in the record that the DPP took a "hard look" at, or even considered, the alleged new circumstances surrounding the proposed project in deciding not to require an SEIS. Rather, the record reflects that based on its interpretation of the law, the DPP felt that its hands were tied and that it could not consider the alleged new circumstances because no substantive changes had been made to the design of the project itself. Thus, the DPP made its decision not to require an SEIS without considering whether new circumstances or evidence had brought to light significant changes in the project's environmental impacts that

were not previously addressed in the 1985 EIS.[6]

Because of its erroneous view of the law, the DPP failed to consider appropriate factors and follow correct procedures in deciding not to require an SEIS. Thus, its decision was arbitrary and capricious. Based on the existing record, I cannot say that notwithstanding the DPP's failure to consider relevant factors, the question of whether an SEIS is required is so clear-cut that a court can decide the question as a matter of law. I believe there are genuine issues of material fact which preclude the grant of summary judgment for Kuilima and the City or for the Plaintiffs.

Ordinarily, a lapse of time between the acceptance of an EIS and the beginning of construction on components of a project would not constitute changed circumstances requiring an SEIS. In this case, however, the time lapse was extraordinary. The EIS was accepted in 1985. There have been significant delays in the project such that construction on the major portion of the development, including all 1,450 new hotel rooms and 2,054 of the 2,063 new condominium units, had still not begun more than twenty years later. The fact that no specific time limits were established for the completion of the project does not mean that the project's anticipated environmental impacts have not significantly changed as a result of the delays in the project's completion. Indeed, the traffic study attached to the 1985 EIS only projected traffic conditions up through the year 2000. Therefore, the traffic study for the 1985 EIS did not cover the traffic conditions that existed in November 2005 when the DPP began considering Kuilima's Subdivision Application.

Kuilima argues that the alleged new circumstances or evidence cited by Plaintiffs are insufficient to demonstrate a significant change in the project's anticipated environmental impacts. It argues that the 1985 EIS considered the issue of the project's impact on traffic congestion, that updated traffic studies have dealt with the project's impact on traffic, and that Plaintiffs have failed to show that delays in the project have resulted in significant new, different, or increased traffic impacts. Kuilima further argues that the presence of Hawaiian monk seals and green sea turtles were well-known when the 1985 EIS was prepared, and that Plaintiffs have not presented new circumstances or evidence regarding the project's impact on these animals.

The parties' conflicting claims demonstrate that there are genuine issues of material fact regarding whether new circumstances or evidence have revealed significant changes to the project's anticipated environmental impacts. Thus, the circuit court was wrong to affirm the DPP's decision to not require an SEIS on summary judgment.

Under HEPA and the applicable rules, the DPP has the responsibility in the first instance to take a hard look at the relevant factors and exercise its judgment in determining whether an SEIS is warranted. The courts review the agency's ultimate decision under the rule of reason to ensure that the agency's decision was not arbitrary or capricious. As a general rule, in a case like this where the agency's decision-making was flawed because it failed to consider relevant factors, the appropriate remedy is to remand the matter to the agency for reconsideration.

**6.** In its letter to Ben Shafer, the DPP explained that because no time limit had been placed on the development of the project, "Kuilima is entitled to proceed with the project as approved." In its letter to Eric Gill, the DPP enclosed a copy of its letter to Ben Shafer and stated that "as long as [Kuilima] is following procedures and satisfying the requirements of the subdivision rules, regulations, and ordinances, the City must continue to process the [Subdivision] [A]pplication and act on the proposal accordingly."

James Peirson, the DPP planner who prepared the letter to Shafer, stated in his deposition that when determining whether to require an SEIS, the DPP "looked at what [Kuilima] was proposing to do and what the original approvals were from 1986 to determine if there was a substantive change to the project." Mr. Peirson explained that the "passage of time itself could not constitute a substantive change to the project" that could require an SEIS under HRS Chapter 343. Mario Siu–Li, the DPP planner who drafted the letter to Gill, explained in his deposition that an SEIS for the proposed project was not required because "the [S]ubdivision [A]pplication was not changing the existing condition of the properties."

*See Ohio Valley Environmental Coalition v. United States Army Corps of Engineers*, 479 F.Supp.2d 607, 663 (S.D.W.Va.2007) (concluding that "[o]ther than in 'rare circumstances,' the reviewing court should remand the matter to the agency for reconsideration" when the agency fails to take a hard look at relevant environmental impacts in deciding that an EIS was not required (citations omitted)); *O'Reilly v. United States Army Corps of Engineers*, 477 F.3d 225, 239–40 (5th Cir. 2007).

An exception to the general rule would be where the evidence is so clear-cut that the agency could only rationally exercise its judgment in one way. The record in this case does not support this exception.[7] At oral argument, Kuilima acknowledged that if the Environmental Council's rules are interpreted to require the DPP to consider the environmental impact of changed circumstances unrelated to changes in the project's design (and the above exception to the general rule does not apply), then the question of whether an SEIS is required should be returned to the DPP for its decision.

### IV.

Kuilima argues that even if the circuit court erred in granting Kuilima's Third Motion for Summary Judgment, the circuit court's Judgment should be affirmed because there are alternate grounds (not ruled upon by the circuit court) on which to uphold the DPP's decision not to require an SEIS. Kuilima argues that: 1) the Environmental Council exceeded its authority in promulgating the rules empowering an agency to require the preparation of an SEIS; 2) HEPA does not provide a private cause of action for challenging the DPP's decision not to require an SEIS, and even if it did, Plaintiffs' lawsuit was untimely; and 3) Kuilima's application for subdivision approval cannot trigger the DPP's obligation to consider whether an SEIS is required because the Subdivision Application is not a qualifying "action" under HEPA, is exempt from the environmental review process, and involves only ministerial consent.

I am not persuaded that the circuit court's Judgment should be affirmed on these alternate grounds. I disagree with Kuilima's first two arguments. As to Kuilima's third argument, I believe that further development of the record is necessary before the merits of the third argument can be decided.

### A.

As construed in this dissent, the Environmental Council's rules regarding SEISes are consistent with and authorized by HEPA. Thus, the Environmental Council did not exceed its authority in promulgating the SEIS rules.

### B.

A private cause of action to challenge an agency's decision not to require an SEIS is implied in HEPA. *See Hunt v. First Ins. Co. of Hawaii, Ltd.*, 82 Hawai'i 363, 371, 922 P.2d 976, 984 (App.1996) (setting forth the factors to consider in determining whether an implied private cause of action exists). In addition, I would apply the same procedures used to determine the limitations period for challenging an agency's decision not to require an EIS to an agency's decision not to require an SEIS. *See* HRS § 343-7(b) (1993). HAR § 11–200–27 requires an agency to submit its decision regarding whether an SEIS is required to the Office of Environmental Quality Control (OEQC) for publication. In this case, there is no evidence that the DPP submitted its decision not to require an SEIS to the OEQC or that a public notice of that decision was published by OEQC. Thus, the

---

7. Courts have also held that a remand to the agency was not necessary where after a lawsuit was initiated, the agency cured its error by taking the required hard look at the alleged new circumstances and information and explained its reasoning for not requiring an SEIS. *See Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1025–27 (9th Cir.1980); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558–61 (9th Cir.2000). In these cases, the court was able to review the propriety of the agency's decision without requiring a remand. *Warm Springs*, 621 F.2d at 1025–27; *Friends of the Clearwater*, 222 F.3d at 558–61. Here, however, the DPP did not cure its error by taking a hard look at the environmental concerns raised by the Plaintiffs after the lawsuit was filed.

limitations period on Plaintiffs' suit did not run.

### C.

Further development of the record is necessary to resolve Kuilima's claim that its Subdivision Application cannot trigger the DPP's obligation to consider whether an SEIS is required. I believe this issue turns on whether or not the DPP has sufficient discretion in rendering its decision on the Subdivision Application that its decision-making would meaningfully and usefully be informed by an SEIS.

As noted, the purpose of HEPA is to provide the agency with relevant information about the environmental impacts of a proposed project so that it can make informed decisions about the project. HRS § 343–1 ("It is the' purpose of [HEPA] to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations."). An SEIS would serve no useful purpose if the project had already progressed beyond the point where the agency's decision-making could meaningfully affect the project or if the agency lacked the ability to exercise meaningful discretion in deciding the matter for which the SEIS was sought.

In addressing the question of whether a project had progressed too far to require an SEIS under NEPA, the United States Supreme Court stated:

[A]lthough it would make sense to hold NEPA inapplicable at some point in the life of a project, because the agency would no longer have a meaningful opportunity to weigh the benefits of the project versus the detrimental effects on the environment, up to that point, NEPA cases have generally required agencies to file environmental impact statements when the remaining governmental action would be environmentally significant.

. . . .

. . . Application of the rule of reason thus turns on the value of the new information to the still pending decisionmaking process. In this respect the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare' an EIS in the first instance: If there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

Marsh, 490 U.S. at 371–72, 374, 109 S.Ct. 1851 (quotation marks, citations, footnotes and brackets omitted) (emphases added).

Kuilima and Plaintiffs disagree on 1) the extent to which the DPP may exercise discretion in deciding whether to approve Kuilima's Subdivision Application; 2) whether the DPP's decision on the Subdivision Application is properly characterized as a discretionary consent or a ministerial consent; and 3) whether the project has already progressed beyond the point where an SEIS can meaningfully and usefully inform the DPP's decision-making.[8] There appear to be factual questions that need to be answered in order to resolve these disputes. I believe that further development of the record is necessary to determine whether the DPP has sufficient discretion in rendering its decision on the Subdivision Application to be meaningfully and usefully informed by an SEIS.

In my view, the dispute between Kuilima and the Plaintiffs over whether the Subdivision Application constitutes a qualifying "action" under HEPA and whether the Subdivision Application is exempted from the environmental review process misses the mark. HEPA is designed to require consideration of the cumulative environmen-

8. HRS § 343–2 (1993) defines the term "approval" to mean "a discretionary consent required from an agency prior to actual implementation of an action" and the term "discretionary consent" to mean "a consent, sanction, or recommendation from an agency for which judgment and free will may be exercised by the issuing agency, as distinguished from a ministerial consent." HAR § 11–200–2 defines the term "ministerial consent" to mean "a consent, sanction, or recommendation from an agency upon a given set of facts, as prescribed by law or rule without the use of judgment or discretion."

tal impacts of an entire project. *See Superferry I*, 115 Hawai'i at 329–35, 167 P.3d at 336–42. That is why "piecemealing" or breaking a project into component parts to escape full environmental review is not permitted. *See id.* at 331, 167 P.3d at 338. Kuilima does not dispute that an EIS was required for its development project and that the project was not exempt under HEPA. The project has already triggered the need for an EIS under HEPA, and the subdivision approval is an integral component of the project. It is not necessary for Plaintiffs to show that the Subdivision Application would also independently trigger the need for environmental review under HEPA in order to pursue their claim for an SEIS.

### V.

For the foregoing reasons, I believe the circuit court's Judgment should be vacated and the case should be remanded for further proceedings. Accordingly, I respectfully dissent.